695 A.2d 1301

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. JOHN CHEW, DEFENDANT–APPELLANT.

Argued October 22, 1996—Decided June 26, 1997.

*Matthew Astore*, Deputy Public Defender II, and *Jacqueline E. Turner*, Assistant Deputy Public Defender, argued the cause for appellant (*Susan L. Reisner*, Public Defender, attorney).

*Bennett A. Barlyn*, Deputy Attorney General, argued the cause for respondent (*Peter Verniero*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

O'HERN, J.

This is a capital murder case. A jury has found defendant John Chew guilty of murdering his former companion in order to obtain insurance proceeds on her life. Major issues raised in his appeal are: (1) whether the statutory aggravating factor, *N.J.S.A.* 2C:11–3 c(4)(d), which makes death-eligible a "murder as consideration for the receipt, or in expectation of the receipt of anything of pecuniary value," only covers contract killings and not killings to obtain insurance proceeds; (2) whether statements taken by police after defendant had asked for an attorney were admitted in violation of his constitutional rights; and (3) whether defendant was denied his fair-trial right to have the jury consider the non-capital verdict of murder as an accomplice. In addition, defendant asserts that various other trial errors require reversal of his conviction.

We find (1) that *N.J.S.A.* 2C:11–3 c(4)(d) does cover a killing to obtain insurance proceeds; (2) that after defendant had invoked his right to remain silent and to have the assistance of counsel, he voluntarily initiated further conversation with police and waived the protections of the Fifth Amendment and the state privilege against self-incrimination; and (3) that the court correctly charged the jury that in order to convict defendant of capital murder it must unanimously agree that defendant alone had committed the murder by his own conduct. No other trial errors taint the verdict, and we affirm the conviction of capital murder and the

sentence of death. We will conduct proportionality review of defendant's sentence in later proceedings.

## I

At approximately 9:00 a.m. on January 13, 1993, police found the body of Theresa Bowman in the driver's seat of a Corvette parked in the rear of the parking lot of the Woodbridge Hilton. Ms. Bowman had been dead approximately ten hours. Her throat had been slashed. Found with the body was a piece of paper with a Newark beeper number and the name "Joe Martin" written on it.

The Corvette was registered to John Chew of Mystic Isle. The police contacted Chew and set up an appointment to meet at Chew's residence that afternoon. Prior to meeting with Chew, the police interviewed Alejandro Mecalco, a chef at the Woodbridge Hilton. Mecalco stated that he had seen a man "grabbing" a woman in the car. He described the man as having "a round face, dark eyes, full beard, mustache, and fine hair, well combed." A police sketch depicted this man as similar in appearance to Kenny Rogers, a contemporary recording artist. A police officer who had patrolled the Woodbridge Hilton parking lot that night stated that he saw two persons in the car, one of whom had blond hair.

When police arrived at Chew's residence at 4:10 p.m. on January 13, Chew appeared "unkempt." Chew did not have a beard and did not match the description provided by Mecalco. He was in pain and exhibited a wobbly gait. Chew told the police that he had back and foot injuries resulting from a recent fall while working as a roofer. During this meeting, the police obtained Chew's first statement. The setting was non-custodial and informal. Chew spoke with the police for approximately fifteen minutes. Chew said that he had last seen Ms. Bowman on the evening of January 12, 1993, when she left for a Woodbridge restaurant to pick up her paycheck to cover an overdrawn check that she had used to buy pain medication for Chew.

According to this first statement, both Ms. Bowman and defendant drove to the home of Chew's sister, Crystal Charette, and Theresa subsequently drove off alone in defendant's Corvette. John had loaned his second car to Crystal. Chew claimed that after Theresa left, he remained at Crystal's home with Crystal and her roommate, Helen Borden, for an hour-and-a-half before both women drove him home.

After the police left, Chew drove to Crystal's home to speak with Crystal and Helen. Chew told them that he was about to be blamed for something that he did not do. He said that a drug deal had turned bad and that he needed an alibi. He asked them to tell the police that they had visited him on the evening of January 12 and had remained at his home the entire evening. They agreed.

Shortly after midnight on January 14, 1993, Woodbridge Detective Geoffrey Kerwin, the lead investigator in the Bowman murder, interviewed Crystal and Helen at Crystal's home. At that meeting, Crystal and Helen corroborated Chew's first statement. In the early afternoon of January 14, Detective Kerwin again visited Chew to request an interview and to obtain consent to take blood samples and to search Chew's home and car. Although not in custody, Chew signed a waiver of rights prior to the interview. In a brief taped statement, Chew repeated the story he had told the police on January 13, and provided information about his relationship with Ms. Bowman. The two had met in January 1988, when Theresa was twenty-three or twenty-four, and Chew was about twelve years older. Chew then was working as a roofer installing shingling. By 1989, they were living together. At the time of the murder, the couple lived in Mystic Island.

Upon completion of the search, the investigators traveled with defendant to Crystal's home and obtained formal, taped statements from Crystal and Helen. The taped statements exculpated Chew.

On January 15, 1993, the police received a number of calls suggesting a motive for the murder of Theresa Bowman: Chew

was the beneficiary of a $250,000 insurance policy on Ms. Bowman's life. The first call was from the life insurance salesman who had sold a joint policy to John and Theresa in 1991.

On New Year's Eve, 1992, thirteen days before the murder, Chew stopped at the agent's home and stated that he wanted to pay December's premium in cash because his check had bounced and he did not want the policy to lapse. After calling his office and suggesting other payment options, the agent finally accepted a money order. No customer had ever before come directly to the agent's home with cash.

George Tilton, a former employee of Chew, reported that in 1991 Chew had offered him $10,000 to kill Ms. Bowman. Tilton told the police that Chew wanted the victim dead to collect the insurance proceeds. Tilton testified that Chew proposed the conspiracy repeatedly between June and November 1991.

The third caller was Chew's son, Robert Chew, who phoned the police from the Ocean County Jail, where he was serving a sentence for a number of crimes. Robert Chew claimed that in December 1991, Chew had told him about the mutual life insurance policy and about the plan to kill Ms. Bowman for the proceeds.

Randy F., a Linden mechanic, provided another piece of the puzzle. Randy F. met Theresa in November 1992, while John was in Florida. They commenced an affair and she spoke of leaving Chew. Randy F. believed that Theresa planned to leave defendant and move in with him on January 13, 1993, after Chew received money from a settlement of an unrelated lawsuit. After the settlement, Chew was to give Ms. Bowman one of his cars and $10,000. Randy F. testified that Theresa phoned him on January 12 and said that she and Chew were driving to a location on the Garden State Parkway to pick up Chew's settlement check in the amount of $28,000.

Thus, the State had a specific reason for why Chew acted and when he did: the fear that Ms. Bowman was going to leave and

that Theresa might discontinue the life insurance policy. In the morning of January 23, the police left for Chew's residence to place him under arrest.

Chew's mother met the police at the door and informed them that he was sleeping. Police roused Chew and Detective Kerwin placed defendant under arrest. Chew asked the officers to bring medicine for his back pain. As defendant was leaving, in the custody of the police, he asked his mother to phone his attorney, Stephen Secare.

Another team of investigators went to defendant's sister's home. In the first of several additional statements, Crystal said that John had called her from his home on the night of the murder and asked her to pick him up from the Woodbridge Hilton later that night. Crystal said that John told her that he and Theresa were going to pick up Theresa's paycheck from her place of work, and that although defendant wanted to return immediately, Theresa intended to stay with friends.

Crystal arrived at the hotel parking lot at about 9:20 p.m. She spotted a Corvette, but she was not sure whether it was her brother's car. Crystal moved her car closer, and saw defendant get out of the Corvette. He was not injured, but there was blood on his clothes. Crystal denied having asked her brother any questions about what had happened.

Defendant removed his outer clothes, put them in a plastic bag, and instructed Helen (who had accompanied Crystal) to pour bleach into the bag. The bag and bleach were already in the car. Crystal denied seeing a knife. Defendant dumped the bag containing the bloodied clothes. Crystal told the police that after returning to Chew's home, he told her what to tell the police and threatened her to remain quiet.

Helen Borden told much the same story. She said that she heard a "scream" that she thought came from the Corvette. About a minute later, defendant came running out of the Corvette and got into the car.

Crystal, Helen, and defendant were brought to the Ocean County Prosecutor's Office. Crystal and Helen were questioned separately and defendant was placed in a different room for a polygraph (lie-detector) test. He was given medication for his back pain.

After confronting defendant with the inculpatory statements of Crystal and Helen, Detective Kerwin read defendant his *Miranda* warnings and began the first interrogation of the day at about 10:53 a.m. Defendant agreed to provide a taped statement, but refused to sign a *Miranda* card and insisted that the taped statement not discuss the murder. Defendant's taped statement merely placed him at the scene and acknowledged that his sister and Helen had driven him home from the Woodbridge Hilton that evening.

After the taped statement concluded, defendant provided the police with a more detailed version of the events. In this retelling, defendant stated that he and Ms. Bowman had gone to Woodbridge on January 12, 1993, to complete a drug deal. Ms. Bowman was to handle the deal because only she knew "Joe," the other drug dealer. Defendant stated that he had waited inside the Hilton. Defendant returned to the car and found Ms. Bowman murdered.

About 30 minutes after the morning interrogation had concluded, defendant requested and was granted permission to call his attorney, Stephen Secare. Defendant did not locate Mr. Secare, but reached only an answering machine. All questioning of defendant ceased.

Police then took defendant to the Woodbridge Police Station. Allegedly due to defendant's back condition and concern that defendant might be suicidal, Kerwin handcuffed defendant to a cushioned chair in an office rather than place him in a jail cell. At 4:00 p.m., defendant was formally charged with murder. Defendant again complained about his back pain, and was again given medication. About two hours later, defendant asked to speak with Kerwin.

Defendant was crying when Kerwin entered the room. According to Kerwin, defendant asked "[w]hat am I facing." Kerwin did not mention the death penalty, but told defendant that he might face thirty years or more in prison. Kerwin also outlined potential lesser sentences. Defendant then began to talk.

Chew again spoke of a cocaine deal, this time acknowledging that Ms. Bowman was alive when he had returned from the Hilton to the Corvette. She and defendant began to argue after Bowman claimed she was "ripped off" by the buyer. When Theresa told John she was having sex with Randy, defendant said that he "went off" on her.

Detective Kerwin stopped defendant at that point, called in another detective, readministered the *Miranda* warnings, and had him sign a waiver. Between 6:13 and 6:24 p.m., Kerwin obtained a second taped statement.

In this statement, defendant again acknowledged driving to the Woodbridge Hilton with Ms. Bowman on the night of January 12. He stated that the purpose of the trip was to sell a kilo of cocaine that defendant had purchased while in Florida. (Chew's brother (also named Robert Chew) later testified that while he and defendant were in Florida, defendant showed him a kilo of cocaine that defendant said he was bringing back to New Jersey to sell.) As in the earlier story, defendant did not know the prospective buyer because he was Ms. Bowman's contact.

According to defendant, while Ms. Bowman stayed in the car waiting for the buyer, defendant went to wait in the doorway of the Hilton. He never saw anyone get into the Corvette. After approximately forty-five minutes, defendant returned to the car. In this version, when defendant returned to the car, Ms. Bowman was still alive. She told defendant that the contact did meet her but "she got ripped off." The couple had an argument. Ms. Bowman hit defendant "a couple of times in [the] face" and scratched him in the chin. Defendant did not remember having stabbed Ms. Bowman.

After fighting with Ms. Bowman, defendant left his Corvette and met Crystal and Helen, who were waiting nearby in his other car. Defendant asked them to pick him up because he and Ms. Bowman were going to separate for a while after defendant gave Ms. Bowman $10,000 of the $25,000 expected proceeds from the drug deal. Defendant remembered feeling very frightened because "[t]here was just blood all over." Defendant repeated that he did not know whether he committed the murder.

Defendant did remember changing his clothes and disposing of his bloodied clothes in a dumpster. Defendant also remembered begging his sister and Helen not to tell the police about the events of the evening. He did not recall threatening them, but acknowledged that "there's so much I don't remember."

After providing his statement, defendant was processed for transfer to the Middlesex County Adult Correction Center. While there, defendant met with two correctional officials, including a registered nurse employed by the correctional institution. Both testified for the State at the *Miranda* hearing that defendant did not seem to be under the influence of any drugs or undue stress, but rather appeared calm and cooperative.

A grand jury charged defendant with purposeful or knowing murder by his own conduct, possession of a weapon (a knife) for an unlawful purpose, terroristic threats, and other offenses, not relevant here, which the trial court later dismissed. The prosecutor served notice of one aggravating factor: that defendant killed Theresa Bowman as consideration for the receipt, or in expectation of the receipt of anything of pecuniary value. *N.J.S.A.* 2C:11–3 c(4)(d).

Defendant moved to dismiss the aggravating factor. The trial court denied defendant's motion. *State v. Chew,* 278 *N.J.Super.* 391, 651 *A.*2d 124 (Law Div.1994). It ruled that the aggravating factor applies to those who kill to obtain insurance proceeds, "[i]n light of the language of the statute, the legislative history, policy concerns, and concepts of reasonableness." *Id.* at 401, 651 *A.*2d 124. The trial court reasoned that consideration means "[a]ny

benefit conferred, or agreed to be conferred, upon the promisor, by any other person … as an inducement to the promisor." *Id.* at 396, 651 *A.2d* 124. The court explained that

the term "as consideration for" in the first clause of subsection (d) provides a full parallel to the two-part structure of subsection (e) [the procuring factor] on its own by encompassing defendants who kill for advance payment as well as those who kill upon the promise of later payment. The second clause, "in expectation of the receipt of anything of pecuniary value," can then be read to authorize the imposition of capital punishment for other scenarios beyond that of murder for hire. The broad language, "*anything* of pecuniary value," certainly supports the wider interpretation to include murders committed for the purpose of obtaining insurance benefits.

[*Id.* at 397, 651 *A.2d* 124.]

The Appellate Division denied defendant's motion for leave to appeal the denial of his motion to dismiss the aggravating factor.

Defendant also moved to suppress his statements to the police. Following a *Miranda* hearing, the court granted in part and denied in part defendant's motion to suppress. The court found that defendant's first custodial statement at 10:53 a.m. on the day of the arrest had been obtained in violation of his Fifth Amendment right to counsel and should be suppressed at trial. But the court found that defendant voluntarily had initiated the second custodial statement, made after 6:00 p.m., and that the second statement was sufficiently removed from the first so as to be admissible against defendant at trial.

On June 13, 1995, the jury returned a verdict of guilty on the two remaining counts: purposeful or knowing murder by defendant's own conduct, in violation of *N.J.S.A.* 2C:11-3 a(1) or (2), and possession of a weapon for an unlawful purpose, in violation of *N.J.S.A.* 2C:39-4 d.

The penalty-phase trial took place between June 19 and June 22, 1995. The State did not present any new evidence, but the defense called eight witnesses. A member of the parole board testified that the alternative sentence for murder was thirty years imprisonment. A forensic social worker interviewed family members and reviewed family records. She described a family history of beatings, drinking binges, abuse, unfaithfulness, and lack of love

or encouragement. Defendant's mother and sister testified similarly.

Defendant's eleven-year-old daughter Valerie spoke of her love for her father and of her contacts with him. A family therapist concluded that Valerie's continued contacts with her father would have a positive effect and that the two of them enjoyed a positive relationship. Defendant gave an allocution in which he sought mercy for the sake of his daughter.

The jury unanimously and beyond a reasonable doubt found defendant guilty of murder in expectation of the receipt of anything of pecuniary value. The jury also found the existence of the catch-all mitigating factor, *N.J.S.A.* 2C:11–3 c(5)(h), and credited each of ten mitigating factors raised by defendant. The jury unanimously and beyond a reasonable doubt found that the single aggravating factor outweighed all of the mitigating factors found.

The jury returned a death penalty verdict and the court sentenced defendant to death. It merged the weapons conviction with the murder conviction. Defendant appealed directly to this Court as of right. *R.* 2:2–1(a)(3). We allowed the State to file a cross-appeal of certain evidentiary rulings. Defendant did not file a reply brief.

## II

Is a killing committed for the purpose of obtaining insurance proceeds a killing "as consideration for the receipt, or in expectation of the receipt of anything of pecuniary value"?

■ The statutory aggravating factors in our capital-sentencing scheme narrow the class of death-eligible murderers and guide the jury's discretion in determining the appropriateness of a death sentence. *State v. Ramseur,* 106 *N.J.* 123, 185–86, 524 *A.2d* 188 (1987). New Jersey's Capital Punishment Act (the Act) contains eleven aggravating factors that make a murder eligible for sentence of death. Among them are *N.J.S.A.* 2C:11–3 c(4)(d), the "pecuniary gain" factor, and 2C:11–3 c(4)(e), the "procuring" fac-

tor.[1] Familiar examples of the two factors are found in *State v. DiFrisco*, 137 *N.J.* 434, 645 *A.*2d 734 (1994) (*DiFrisco II* ), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996), the contract killer, and *State v. Marshall,* 123 *N.J.* 1, 586 *A.*2d 85 (1991) (*Marshall I* ), the hiring of a killer.

Among other jurisdictions, killing for pecuniary gain is the most frequently employed statutory aggravating factor. Raymond J. Pascucci, *Capital Punishment in 1984: Abandoning the Pursuit of Fairness and Consistency,* 69 *Cornell L.Rev.* 1129, 1227 (1984). When, in 1982, the New Jersey Legislature debated the adoption of the Act, many other jurisdictions had already defined the special circumstance or aggravating factor of murder for financial gain as establishing death eligibility. In 1978, a California voters' initiative amended a special circumstance that had been limited to hired guns to create death eligibility when "[t]he murder was intentional and carried out for financial gain." *People v. Bigelow,* 37 *Cal.*3d 731, 750, 209 *Cal.Rptr.* 328, 339, 691 *P.*2d 994, 1005 (1984). The *Bigelow* court had no legislative history to guide it in the construction of the financial-gain special circumstance. Concerned that the new language would create an overlap between the financial-gain special circumstance and that of felony murder (since most robberies, burglaries, and kidnappings are committed for financial gain), the court reviewed decisions elsewhere. It observed that Nebraska had construed an aggravating factor of murder for pecuniary gain to apply:

(1) to the hired gun, (2) to the hirers of the gun, and (3) to murder motivated primarily by a desire for pecuniary gain as in the case of a murder of an insured by

---

[1] For convenience, we abbreviate the citations to the New Jersey death penalty act.

The c(4)(d) aggravating factor provides:

The defendant committed the murder as consideration for the receipt, or in expectation of the receipt of anything of pecuniary value.

The c(4)(e) aggravating factor provides:

The defendant procured the commission of the offense by payment or promise of payment of anything of pecuniary value.

the beneficiary of a life insurance policy for the purpose of obtaining the proceeds, or the murder of a testator of a legatee or devisee to secure a legacy or a devise. [*Id.* at 751, 209 Cal.Rptr. at 340, 691 P.2d at 1006 (citing *State v. Rust,* 197 *Neb.* 528, 250 *N.W.*2d 867, 874, *cert. denied,* 434 *U.S.* 912, 98 *S.Ct.* 313, 54 *L.Ed.*2d 198 (1977)).]

The California court adopted a narrowing construction to avoid overlap with the other felony murder factors and held that "the financial gain special circumstance applies only when the victim's death is the consideration for, or an essential prerequisite to the financial gain sought by the defendant." *Ibid.*

Of course, an aggravating factor can be drafted to cover only the hired gun or the one who procures the hired gun.[2] For example, Pennsylvania's death-penalty statute recognizes the aggravating factor of "killing for hire" only when "[the] defendant paid or was paid by another person or had contracted to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim." 42 *Pa. Cons.Stat. Ann.* § 9711(d)(2) (1996); *Commonwealth v. Burgos,* 530 *Pa.* 473, 610 *A.*2d 11 (1992). But almost every jurisdiction that has considered a broadly-worded pecuniary gain factor has applied the factor to killings to collect insurance proceeds.

Arizona law contains the identical language of the New Jersey aggravating factor. *Ariz.Rev.Stat.* § 13–703(F)(5) (1996) (making death-eligible a killing "as consideration for the receipt, or in expectation of the receipt, of something of pecuniary value"). Arizona allows the "pecuniary gain" factor when

hope of pecuniary gain . . . provide[s] the impetus for the murder. For example, if a beneficiary killed an insured in order to gain the proceeds of a life insurance policy this aggravating circumstance would be satisfied. On the other hand, an unexpected or accidental death that was not in furtherance of the defendant's goal

---

2 Richard A. Rosen, *Felony Murder and the Eighth Amendment Jurisprudence of Death,* 31 *B.C. L.Rev.* 1103, 1170 n. 73 (1990) (citing *Or.Rev.Stat.* § 163.095(1)(a) and (b) (1987) (defendant hired killer or solicited another to murder for hire); 42 *Pa. Cons.Stat. Ann.* § 9711(d)(2) (Purdon 1982 & Supp.1989) (defendant paid killer or was paid to kill); *Va.Code Ann.* § 18.2–31(b) (1988) (defendant hired to kill by another); *Wash. Rev.Code Ann.* § 10.95.020(4) and (5) (Supp.1989) (defendant committed murder pursuant to agreement to receive money for killing or offering to pay for murder)).

of pecuniary gain, which occurs during the course of or flight from a robbery, does not in itself provide a sufficient basis for finding the same aggravating circumstance. The aggravating circumstance [where the defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value] should be found only in those cases where the murder is part of the defendant's overall goal of pecuniary gain, not merely when a death occurs during which time the defendant benefitted financially.

[*State v. Nash*, 143 Ariz. 392, 694 P.2d 222, 235, *cert. denied*, 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 706 (1985).]

As early as 1980, Arizona had found that a killing for the purpose of obtaining insurance would satisfy the aggravating circumstance, although the court did not find sufficient evidence in the case to satisfy the factor. *State v. Madsen*, 125 Ariz. 346, 609 P.2d 1046 (en banc), *cert. denied*, 449 U.S. 873, 101 S.Ct. 213, 66 L.Ed.2d 93 (1980).

Florida has concluded that its special circumstance of "murder for financial gain" applies when a person kills to obtain insurance proceeds. *Zeigler v. State*, 402 So.2d 365 (Fla.1981), *cert. denied*, 455 U.S. 1035, 102 S.Ct. 1739, 72 L.Ed.2d 153 (1982). Delaware's death penalty statute, which was modeled after Florida's, has been interpreted in the same way. *Ferguson v. State*, 642 A.2d 772 (Del.1994).

The principles were so well known that a Mississippi judge would later write:

Anyone familiar with the evolution of the "pecuniary gain" concept in capital murder litigation around the country is aware that this aggravating circumstance was not designed for application to the armed robbery capital murder. Rather, this language contemplates the hired killing or, as it is sometimes called, the contract murder. It might also apply to a murder motivated by a desire to collect life insurance proceeds. Such an approach to [the aggravating factor] would be consistent with correct grammatical usage of the words employed and with the idea that aggravating circumstances are intended to focus the jury's attention upon aspects of a murder thought to render it a more reprehensible act than is murder per se.

[*Wiley v. State*, 484 So.2d 339, 358 (Miss.) (Robertson, J., concurring), *cert. denied*, 479 U.S. 906, 107 S.Ct. 304, 93 L.Ed.2d 278 (1986), *overruled on other grounds by Willie v. State*, 585 So.2d 660 (Miss.1991).]

Defendant insists that the plain language and legislative history of our c(4)(d) factor preclude the same interpretation here.

The argument is based on sentence structure. Because the factor describes "murder as consideration" for the receipt of anything of pecuniary value, defendant reasons that the term "consideration" applies to both clauses of the factor. From that premise, because consideration denotes a contract, he argues that the killer must have a contract for the expectation of money to become death eligible. Defendant reads factor c(4)(d) to be limited to cover an agreement to kill in consideration of (a) the receipt or (b) the expectation of receipt of anything of pecuniary value.

Even were we to agree that the word "consideration" is limited to the notion of a contract, we disagree that the sentence structure signals that the "expectation of receipt" clause depends on the word "consideration." The two clauses are distinct. There is no suggestion in the legislative history that the c(4)(d) factor is the twin of the c(4)(e) procuring factor that makes death eligible one who procures the commission of murder by the payment or promise of payment of anything of pecuniary value.

The Federal Death Penalty Act and the Federal Controlled Substance Act contain aggravating factors for determining capital punishment. *See* 18 *U.S.C.* § 3592(c)(8); 21 *U.S.C.* § 848(n) (listing aggravating factors). Both federal acts contain the identical language found in our c(4)(d) factor. In *United States v. Walker*, 910 *F.Supp.* 837 (N.D.N.Y.1995), a defendant sought to bar the use of the pecuniary gain factor to cover a killing to obtain proceeds of a drug deal.[3] The court observed that the federal factor had two prongs: that the offense was committed "as consideration for the receipt" or "in expectation of the receipt" of something of pecuniary value. *Id.* at 848. It agreed that the use of "as consideration for" language in the first prong does contemplate murder for hire but that "to transport that restriction to the

---

[3] The defendant acknowledged that the factor covered either "murder for hire or ... [killing] to gain an inheritance or life insurance proceeds." *Walker, supra,* 910 *F.Supp.* at 848.

second, in expectation of the receipt prong, would render the second clause mere surplusage." *Ibid.*

The court also rejected the argument that by locating the pecuniary gain factor following the procuring factor in the federal statute, Congress had intended only "to identify the flip-side of procuring a murder for hire." *Ibid.* In short, the court concluded that nothing in the plain language of the federal statute or its history limited the factor to the case of the hired gun.

■ Although our statute does not sustain the breadth of the factor adopted by the *Walker* court, we agree that the language of the factor is not limited to the case of the hired gun. This interpretation does not mean we are creating two separate factors within one, inconsistently with the structure of the Act. Rather, there is one factor, the "pecuniary gain" factor. An Assembly version of the Act would have included the expectation of the elimination of pecuniary loss as a potential aggravating factor, suggesting that the legislators believed that the factor was not limited to the case of the hired gun. Assembly Judiciary, Law, Public Safety, and Defense Committee, *Statement to Bill No. 771*, at 6 (May 20, 1982). We acknowledge that Senator Russo, the principal sponsor, referred to the c(4)(d) aggravating factor as the "murder for hire" factor, but we agree with the trial court that that was only "verbal shorthand" for the most familiar application of the factor. *Chew, supra*, 278 *N.J.Super.* at 398, n. 3, 651 *A.2d* 124; *see also* Senate Judiciary Committee, *Capital Punishment Act: Hearings on S. 112*, at 14 (Feb. 26, 1982). The New Jersey Act is a "hybrid" of the Georgia and Florida statutes. *State v. Bey*, 112 *N.J.* 123, 217, 548 *A.2d* 887 (1988) (*Bey II* ) (Handler, J., dissenting), *cert. denied*, 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.2d* 1093 (1995). When a statute is drafted on the pattern of another jurisdiction, it is appropriate to consider interpretations in that jurisdiction. *Ramseur, supra*, 106 *N.J.* at 204, 524 *A.2d* 188. The drafters of c(4)(d) were presumably aware of interpretations that Florida gave to a similar factor, as well as the interpretations Arizona gave to its factor.

■ Consistent with interpretation elsewhere, we adopt a limiting construction of the pecuniary gain factor. *Bigelow, supra,* 209 *Cal.Rptr.* 328, 691 *P.*2d at 1006; *Rust, supra,* 250 *N.W.*2d at 874. We believe that it would be double-counting to apply the c(4)(d) factor to a killing in the course of a robbery. *See Cook v. State,* 369 *So.*2d 1251, 1256 (Ala.1979). In order to satisfy New Jersey's pecuniary gain factor (outside of the hired-gun context), it must be found that the killing is the essential prerequisite to the receipt of the gain, not just a killing that results in pecuniary gain.[4] A killing to obtain the proceeds of a drug deal is not a fatal precondition as might be a killing to obtain an inheritance or a share under a partnership agreement. So defined, the factor provides clear guidance.

■ Aggravating circumstances must provide a " 'meaningful basis for distinguishing the few cases in which [death] is imposed from the many cases in which it is not.' " *Gregg v. Georgia,* 428 *U.S.* 153, 188, 96 *S.Ct.* 2909, 2932, 49 *L.Ed.*2d 859, 883 (1976) (opinion of Stewart, Powell, and Stevens, JJ.) (quoting *Furman v. Georgia,* 408 *U.S.* 238, 313, 92 *S.Ct.* 2726, 2764, 33 *L.Ed.*2d 346, 392 (1972) (White, J., concurring)). In *Godfrey v. Georgia,* 446 *U.S.* 420, 100 *S.Ct.* 1759, 64 *L.Ed.*2d 398 (1980), the Supreme Court struck down an aggravating circumstance so vaguely worded that it failed to perform this narrowing function. *See also Ramseur, supra,* 106 *N.J.* at 199–200, 524 *A.*2d 188 (holding c(4)(c) factor void for vagueness unless limiting construction was given).

■ We find no vagueness in the factor on its face or as applied. When a court is asked to review the application of a statutory aggravating factor, it must determine whether the statutory language defining the factor is too vague to provide guidance to the

---

[4] In *State v. Martini,* 139 *N.J.* 3, 78, 651 *A.*2d 949 (1994) (*Martini II*), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995), the Public Defender had described the *Marshall* case as a "fatal precondition murder," a crime that is directly required to complete the criminal scheme. Although the *Marshall* prosecution withdrew the c(4)(d) factor from the jury's consideration, the concept of a fatal precondition guides our construction of this factor.

sentencer. *Walton v. Arizona,* 497 *U.S.* 639, 110 *S.Ct.* 3047, 111 *L.Ed.*2d 511 (1990). If so, the reviewing court must determine whether the sentencing court has further defined the vague terms and if it has done so, whether those definitions are constitutionally sufficient, that is, whether they provide sufficient guidance to the accused and to the sentencer.

A federal district court reviewing the Arizona factor found that "the [pecuniary gain factor] is not facially vague. The clear meaning of the words themselves provide the . . . guidance required." *Woratzeck v. Lewis,* 863 *F.Supp.* 1079, 1088 (D.Ariz. 1994), *aff'd sub nom. Woratzeck v. Stewart,* 97 *F.*3d 329 (9th Cir.1996), *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 1443, 137 *L.Ed.*2d 549 (1997). We doubt very much that one contemplating murder would have been misled by the grammatical structure of the factor. Had anyone cared to mold conduct to avoid the imposition of a death penalty, the actor could easily have learned that other jurisdictions had already considered and rejected the argument that the clauses of the factor were conjunctive. The construction of the c(4)(d) factor adopted by the trial court provided categorical narrowing and clear guidance to the sentencer. This has been the consistent interpretation of the factor. We are informed that the State has sought to apply the c(4)(d) factor only when the killing was a fatal precondition to the receipt of pecuniary gain. *See State v. Marshall,* 130 *N.J.* 109, 175–76, 613 *A.*2d 1059 (1992) (*Marshall II* ), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993) (discussing cases of murders for pecuniary gain, including insurance proceeds). The trial court has correctly given substance to the operative terms of the factor and we find that its construction meets constitutional requirements.

We thus agree with the reported opinion of the trial court that the c(4)(d) factor covers a killing to obtain insurance proceeds.

III

A.

Were defendant's statements admitted in violation of his constitutional rights?

In the course of investigation, the police took approximately six statements from defendant. The trial court separated the statements into three time frames: statements made prior to the arrest on January 23; statements made on January 23 at about 10:53 a.m.; and statements made on January 23 at about 6:00 p.m.[5] No party contests the admissibility of the statements made prior to January 23. Admission of the two statements of January 23 is contested. The State contests the trial court's finding that the 10:53 a.m. statement was inadmissible, and defendant contests the trial court's finding that the 6:00 p.m. statement was admissible.[6]

The trial court found that defendant's request for his mother to contact his attorney, made in the course of his arrest on January 23 and in the presence of the police, was, although ambiguous, an invocation of defendant's right to counsel. Under *Edwards v. Arizona*, 451 *U.S.* 477, 101 *S.Ct.* 1880, 68 *L.Ed.*2d 378 (1981), an accused cannot be subject to further interrogation unless counsel is present or the accused initiates further conversation after invoking the right to counsel. "[A]ny indication of a desire for counsel, however ambiguous, will trigger" *Edwards* protection. *State v. Reed*, 133 *N.J.* 237, 253, 627 *A.*2d 630 (1993). Because the request was ambiguous, the court found that the police should have clarified defendant's statement to protect his right to counsel. *See State v. Elmore*, 205 *N.J.Super.* 373, 500 *A.*2d 1089 (App.Div. 1985) (stating, under *Edwards* and *Miranda*, that defendant's phone call to mother complaining that defendant was not allowed an attorney was sufficient invocation of right to counsel even

---

[5] Defendant gave both taped and untaped statements. For convenience, we aggregate statements occurring around the same time. For example, we refer to defendant's 6:05 p.m. oral and 6:13 p.m. taped statements as the 6:00 p.m. statement.

[6] We granted the State's motion to cross-appeal these rulings in the event there would be a retrial. Because of the disposition that we reach, we need not rule on the State's cross-appeal. However, the issues are recurring and we will address them briefly.

though defendant had not requested one). Without that clarification, the court held that the 10:53 a.m. statement must be suppressed. The administration of *Miranda* warnings once police had taken defendant to the Ocean County Prosecutor's Office did not meet the *Edwards* requirement. *See State v. McCloskey,* 90 *N.J.* 18, 27, 446 *A.*2d 1201 (1982).

The court held that defendant's second statement, made after 6:00 p.m. on January 23, at the Woodbridge Police Station was admissible. The court found that defendant had initiated the conversation, that he had given a statement after a voluntary, knowing, and intelligent waiver of his rights, and that the statement was not the fruit of the improperly obtained 10:53 a.m. statement. Therefore, the court found no constitutional violations.

Defendant challenges the admission of the second January 23 statement. He argues that, after invoking his right to counsel, he did not initiate further conversation and he did not knowingly and voluntarily waive his right to counsel because he was misinformed by the police about the nature of the charges and subjected to severe conditions of confinement. Even if the Court finds that defendant's rights were not violated, defendant argues that the second statement was tainted by the earlier failure of police and investigators to honor scrupulously his initial invocation of the right to counsel.

## B.

■ New Jersey law governing the privilege against self-incrimination generally parallels federal constitutional doctrine. We paraphrase the summary of that law set forth in *Reed, supra,* 133 *N.J.* at 250–51, 627 *A.*2d 630. In New Jersey, the right against self-incrimination is founded on a common-law and statutory— rather than a constitutional—basis. *See State v. Hartley,* 103 *N.J.* 252, 260, 511 *A.*2d 80 (1986); *see also N.J.S.A.* 2A:84A–19; *N.J.R.E.* 502 and 503. Although lacking a constitutional provision expressly establishing the right, "[t]he privilege against self-incrimination has been an integral thread in the fabric of New

Jersey common law." *Hartley, supra,* 103 *N.J.* at 286, 511 *A.*2d 80 (citing *State v. Fary,* 19 *N.J.* 431, 435, 117 *A.*2d 499 (1955)).

■ Like the right embodied in the Fifth Amendment to the federal Constitution, the state privilege against self-incrimination is not self-implementing. Although "the Constitution does not require any specific code of procedures for protecting the privilege against self-incrimination during custodial interrogation," *Miranda v. Arizona,* 384 *U.S.* 436, 490, 86 *S.Ct.* 1602, 1636, 16 *L.Ed.*2d 694, 732 (1966), the United States Supreme Court and this Court have developed mechanisms for safeguarding that right. Foremost among those mechanisms are the so-called *"Miranda"* warnings. *Id.* at 479, 86 *S.Ct.* at 1630, 16 *L.Ed.*2d at 726; *Hartley, supra,* 103 *N.J.* at 262, 511 *A.*2d 80. *Miranda* warnings inform a suspect not only of the basic right against self-incrimination, but of other ancillary rights that effectuate that basic right. The ancillary rights collectively give substance to the right against self-incrimination during a custodial police interrogation, *Reed, supra,* 133 *N.J.* at 251, 627 *A.*2d 630, and are essential to preserve that right.

New Jersey law in some circumstances affords greater protection of the right against self-incrimination than does federal law. For example, the Court has expanded ancillary rights in requiring readministration of *Miranda* warnings as a condition to continued interrogation after invocation of the right to remain silent. *Hartley, supra,* 103 *N.J.* 252, 511 *A.*2d 80.

The right to counsel has also been the object of special judicial solicitude. *See Reed, supra,* 133 *N.J.* at 251, 627 *A.*2d 630 (finding under state privilege against self-incrimination that suspects undergoing custodial interrogation have additional ancillary right to be informed that counsel is attempting to reach the suspect); *State v. Sanchez,* 129 *N.J.* 261, 277, 609 *A.*2d 400 (1992) (holding that after indictment and before arraignment State may not institute conversations with defendants without consent of counsel).

 Under *Miranda*, prior to any custodial interrogation, an accused must be advised of the Fifth Amendment right to remain silent and to have an attorney present during questioning. Once an accused invokes the right to counsel, that right must be "scrupulously honored." *Michigan v. Mosley*, 423 *U.S.* 96, 103, 96 *S.Ct.* 321, 326, 46 *L.Ed.*2d 313, 321 (1975). "Scrupulously honor[ing]" the invocation of the right to counsel entails terminating all questioning "until counsel has been made available [or] unless the accused [ ] initiates further communication, exchanges, or conversations with the police." *Edwards, supra*, 451 *U.S.* at 484–85, 101 *S.Ct.* at 1885, 68 *L.Ed.*2d at 386.

 If an accused does initiate a conversation after invoking his rights, that conversation may be admissible if the initiation constitutes a knowing, intelligent, and voluntary waiver of the accused's rights. *Miranda, supra*, 384 *U.S.* at 444, 86 *S.Ct.* at 1612, 16 *L.Ed.*2d at 707. The State bears a "heavy burden" of demonstrating that the waiver was knowing, intelligent, and voluntary. *Hartley, supra*, 103 *N.J.* at 260, 511 *A.*2d 80; *see also State v. Galloway*, 133 *N.J.* 631, 654, 628 *A.*2d 735 (1993) (holding State must prove voluntariness of confession beyond a reasonable doubt).

## C.

The first question is whether defendant's anticipatory request to his mother to call his attorney was sufficiently clear to trigger *Edwards* protection. The trial court concluded that the request was sufficiently clear and suppressed the 10:53 a.m. statement. The State advances the threshold argument that even if defendant did intend to invoke his right to counsel, defendant was not yet entitled to *Edwards* protection. The State argues that the Fifth Amendment right to counsel, and the procedural safeguards established under *Miranda*, do not attach until defendant is *both* in custody *and* about to be interrogated. Questioning must "at least be imminent" for the protection to apply.

The State relies on *Alston v. Redman,* 34 *F*.3d 1237 (3d Cir. 1994), *cert. denied,* 513 *U.S.* 1160, 115 *S.Ct.* 1122, 130 *L.Ed.*2d 1085 (1995), and *United States v. LaGrone,* 43 *F*.3d 332 (7th Cir.1994) to support its contentions.[7] Both cases rely on *McNeil v. Wisconsin,* 501 *U.S.* 171, 111 *S.Ct.* 2204, 115 *L.Ed.*2d 158 (1991), which held that an accused's invocation of the Sixth Amendment right to counsel during a judicial proceeding does not invoke the *Miranda* right to counsel for any other, non-related offense. *Id.* at 177–78, 111 *S.Ct.* at 2208–09, 115 *L.Ed.*2d at 168. We find that *Alston, LaGrone,* and *McNeil* do not alter the trial court's analysis. *McNeil* concerned whether an invocation of the right to counsel after the administration of *Miranda* warnings for one offense can extend to other unrelated offenses unknown at the time the *Miranda* warnings were first given. *LaGrone* held *Miranda* warnings given for one purpose cannot be extended to another purpose. And *Alston* concerned the invocation of the right to counsel via a form letter while the defendant was in custody but not in the presence of the police, according to a pre-established procedure designed to facilitate future police interrogation. Those circumstances are not present here.

In *State v. Wright,* we held that "[i]f the individual indicates in any manner at any time *prior to* or during questioning that he wishes to remain silent, the interrogation must cease until an attorney is present." 97 *N.J.* 113, 119, 477 *A.*2d 1265 (1984) (rejecting State's argument that request for counsel during polygraph examination was insufficient to invoke *Miranda* rights

---

[7] *Alston* held that a form letter invoking a prisoner's right to counsel after interrogation and while in custody did not activate *Edwards* protection because the defendant was neither interrogated on the day that he requested counsel nor continually questioned from the date of his first interrogation.

In *LaGrone,* the police raided the defendant's store searching for drugs. After seizing LaGrone, the police asked for consent to search the store and informed the defendant that he had the right to contact his attorney in relation to the search of the store, as required by the Indiana Constitution. *LaGrone, supra,* 43 *F*.3d at 337. The court held that the defendant's attempted call to his attorney regarding the search of the store did not invoke *Miranda* rights for purposes of his own interrogation by the police.

precluding later questioning and finding that such examination constitutes custodial interrogation) (emphasis added).

Even assuming that the request by defendant was timely, the State argues that the statements were ambiguous and urges the Court to follow *Davis v. United States,* 512 *U.S.* 452, 114 *S.Ct.* 2350, 129 *L.Ed.*2d 362 (1994), which holds that when a suspect makes a reference to counsel that is insufficiently clear to invoke the *Edwards* prohibition on further questioning, an interrogating officer need not suspend questioning to clarify the remark.

Because the right to counsel is so fundamental, an equivocal request for an attorney is to be interpreted in a light most favorable to the defendant. *Reed, supra,* 133 *N.J.* at 253, 627 *A.*2d 630; *Wright, supra,* 97 *N.J.* at 119, 477 *A.*2d 1265.[8] When a suspect makes a statement that arguably amounts to an assertion of *Miranda* rights and the interrogating agent recognizes that the statement is susceptible to that construction, questioning should cease and the police should inquire of the suspect about the correct interpretation of the statement. *Bey II, supra,* 112 *N.J.* at 136, 548 *A.*2d 887; *Wright, supra,* 97 *N.J.* at 120, 477 *A.*2d 1265.

Given the narrow balance for the *Davis* majority's analysis, we believe it prudent to continue to apply our precedent. We thus agree with the trial court that defendant's request that his mother contact his attorney was an equivocal invocation of the right to counsel that had to be clarified before questioning could take place. Later administration of *Miranda* warnings did not serve to clarify the earlier equivocal assertion of counsel. *Wright, supra,* 97 *N.J.* at 122, 477 *A.*2d 1265 (holding inadmissible confession given after request for counsel, despite new *Miranda* warnings).

---

[8] Defendant insists that his request was clearly an assertion of his right to counsel and does not even fall within the ambit of ambiguity. Defendant relies on *Elmore, supra,* 205 *N.J.Super.* at 380, 500 *A.*2d 1089. Our analysis does not require that we address defendant's argument.

64

■ The second question is whether defendant "initiated" the conversation with the police at 6:00 p.m. and made a knowing, intelligent, and voluntary waiver of his *Miranda* rights.

In *Oregon v. Bradshaw*, the United States Supreme Court found that inquiries "evinc[ing] a willingness and a desire for a . . . discussion about the investigation. . . [or that] could reasonably have been interpreted by the officer as relating generally to the investigation," constitute initiation. *462 U.S.* 1039, 1045–46, 103 *S.Ct.* 2830, 2835, 77 *L.Ed.*2d 405, 412 (1983). Inquiries incidental to the custodial relationship, such as requesting to use the bathroom or requesting a drink of water, do not initiate further conversation concerning the interrogation. The *Bradshaw* plurality found that the defendant's statement to the police—"Well, what is going to happen to me now?"—made after he was placed in a police vehicle for transport to another location, initiated further contact. *Id.* at 1043–44, 103 *S.Ct.* at 2834, 77 *L.Ed.*2d at 411.

Defendant urges that the Court accept the *Bradshaw* dissent, which reasoned that a court should not presume a defendant invited further interrogation unless the defendant engages with the police regarding "the subject matter of the criminal investigation." *Id.* at 1053, 103 *S.Ct.* at 2839, 77 *L.Ed.*2d at 418 (Marshall, J., dissenting). We have acknowledged that these are "separate tests," but have not flatly chosen one or the other. *State v. Fuller*, 118 *N.J.* 75, 82, 570 *A.*2d 429 (1990). We perceive little difference between the tests and shall apply the minority's phrasing, which we understand to ask whether the accused "was inviting discussion of the crimes for which he was being held." *Id.* at 82, 570 *A.*2d 429. It is clear to us that the facts satisfy this test.

■ It is of course clear, as the trial court found, that defendant unambiguously invoked his right to counsel at 12:50 p.m. on January 23. He was not questioned after that point. At about 6:00 p.m., defendant asked to speak with "Geoff" (Detective Kerwin). Defendant was crying, and asked Kerwin what he was facing. Kerwin told him. Defendant then asked Kerwin if he would visit defendant in jail. When defendant said that he "went

off" on Ms. Bowman, Kerwin stopped defendant, sought the assistance of another investigator, read defendant his rights, and took a taped statement. These facts demonstrate that defendant was "inviting discussion of the crimes for which he was being held," *Fuller, supra*, 118 *N.J.* at 82, 570 *A.*2d 429, and thus initiated the conversation.

Once proper initiation has been established, the State must demonstrate beyond a reasonable doubt that the accused made a knowing, intelligent, and voluntary waiver beyond a reasonable doubt. *See State v. Adams*, 127 *N.J.* 438, 447, 605 *A.*2d 1097 (1992); *State v. Gerald*, 113 *N.J.* 40, 118, 549 *A.*2d 792 (1988). The determination of a valid waiver is based on the facts and circumstances of each case. *Adams, supra*, 127 *N.J.* at 448, 605 *A.*2d 1097. The circumstances that a court may consider include the duration of the interrogation, the advice as to constitutional rights, defendant's age, intelligence, level of education, and the length and conditions of the detention. *Bey II, supra*, 112 *N.J.* at 135, 548 *A.*2d 887.

Defendant argues that there should be fresh *Miranda* warnings after initiation of contact and that a failure to re-*Mirandize* a suspect before the suspect makes an inculpatory statement should be an important factor in assessing whether a waiver was knowing and intelligent. Defendant in effect asks us to establish a per se rule that whenever a defendant initiates a conversation, police should immediately re-*Mirandize* lest the defendant make an incriminating statement.

The trial court found that defendant was a forty-one-year-old male with over twenty arrests in his adult life. He had familiarity with the workings of the criminal justice system. After requesting to speak with his attorney, defendant was provided a phone and not questioned after that point. He received some medication, specifically Flexeril, a muscle relaxant, at about 5:45

p.m. When informed of possible penalties for murder, defendant unilaterally continued the conversation with Kerwin. *Hartley* requires renewed *Miranda* warnings prior to police-initiated questioning; it would be anomalous to require renewed warnings prior to defendant-initiated conversation. Upon initiation, it is prudent for the police to readminister the *Miranda* warnings if the police resume questioning. That was done here.

Defendant further argues that because the police misinformed him about the possible penalties for murder, his statement was not voluntary. He alleges he was deliberately tricked by being informed that he faced a thirty-year term of imprisonment, or possibly a lesser sentence. The death penalty was not mentioned.

Although we are troubled by Kerwin's failure to mention the death penalty, the use of misleading or incomplete statements do not per se preclude a finding of voluntariness. *See Galloway, supra,* 133 *N.J.* at 655, 628 *A.*2d 735. The applicable test is "whether the techniques for extracting the statement[ ] ... are compatible with a system that presumes innocence [and] whether the defendant's will was ... overborne." *Miller v. Fenton,* 474 *U.S.* 104, 116, 106 *S.Ct.* 445, 452–53, 88 *L.Ed.*2d 405, 414–15 (1985). There are certain interrogation techniques that so offend the system of justice that they must be condemned. *Id.* at 109, 106 *S.Ct.* at 449, 88 *L.Ed.*2d at 410. Here, however, Kerwin did not stray into impermissible conduct or a "shadowy area." *Galloway, supra,* 133 *N.J.* at 655, 628 *A.*2d 735. We note that Kerwin was not then aware that the c(4)(d) factor would apply. Nor is defendant's back problem sufficient cause to question the voluntariness of the statement. Defendant was made as comfortable as possible and given pain medication while he was in police custody.

Given the totality of circumstances surrounding the second interrogation and confession, we agree that the State has shown defendant's waiver was knowing, intelligent, and voluntary.

Finally, defendant disputes the trial court's conclusion that the taped statement, given at 6:00 p.m. on January 23, was sufficiently independent of and not tainted by the 10:53 a.m. statement.

 The trial court provided a thorough and reasoned analysis concerning taint, concluding that

defendant's second statement of January 23, 1993 is not tainted by the illegality of the first. The statements are not "inextricably entwined," nor are they part of one continuous process. I find that the second statement was not the "fruit of the poisonous tree." I therefore admit both statements made by defendant on January 23, 1993 after the 6:05 p.m. meeting between defendant and Kerwin.

The court reviewed the admissibility of the 6:00 p.m. statement under criteria set forth in *Hartley, supra,* 103 *N.J.* at 279, 511 *A.*2d 80. The *Hartley* Court described two alternative inquiries to evaluate whether an illegally obtained statement had tainted a subsequent, voluntary, and knowing statement. The first inquiry questions whether "the second statement was so inextricably entwined with the first interrogation procedure as to be part of that same procedure." *Ibid.*

The second inquiry treats the two interrogation processes as separate, and turns on whether the earlier, illegally obtained statement was the result of a constitutional violation or a violation of defendant's ancillary rights.[9] *Id.* at 281, 511 *A.*2d 80. If the first statement stemmed from a constitutional violation, the second statement is evaluated under the "fruit of the poisonous tree" doctrine. *Id.* at 282, 511 *A.*2d 80.

 The trial court found that, although under the constant custody and watch of Woodbridge police, five hours and twenty minutes passed between the two statements. This provided a sufficient break in time between the statements so that they were

---

[9] New Jersey law distinguishes between violations of the ancillary rights of *Miranda,* and violations of the constitutional rights those measures protect. *State v. Burris,* 145 *N.J.* 509, 519, 679 *A.*2d 121 (1996). Failure to issue the *Miranda* safeguards does not rise to the level of a constitutional violation. *Ibid.* However, to elicit a statement after a *Miranda* right has been invoked is a violation of the constitutional right itself. *Ibid.*

not part of the same procedure or process of interrogation.[10] *Id.* at 279, 511 *A.*2d 80.

 Under the second "taint" inquiry, the State must demonstrate that the second statement "was not the *product* of the first ... or that the 'taint' of the first statement was attenuated." *Id.* at 283, 511 *A.*2d 80. A primary concern in this analysis is whether defendant made the statement because he felt that as a result of the first statement, the "cat was already out of the bag." *Id.* at 282, 511 *A.*2d 80 (citing *United States v. Bayer,* 331 *U.S.* 532, 540, 67 *S.Ct.* 1394, 1398, 91 *L.Ed.* 1654, 1660 (1947) (finding that "the psychological and practical disadvantages of having confessed" underlie taint analysis)).

> Factors relevant to this determination include the time between confessions, any intervening circumstances, whether there was a change in place, whether defendant received an adequate warning of his rights, whether the defendant initiated the second confession, the effect of his having previously made a confession, and the purpose and flagrancy of police misconduct.
>
> [*Id.* at 283, 511 *A.*2d 80 (internal quotations and citations omitted).]

---

[10] The State urges this Court to reconsider *Hartley* in light of *Davis*. In *Davis,* the United States Supreme Court found "'that [the] prohibition on further questioning [following the accused's invocation of his right to counsel]—like other respects of *Miranda*—is not itself required by the Fifth Amendment's prohibition on coerced confessions, but is instead justified only by reference to its prophylactic purpose.'" *Id.* at 458, 114 *S.Ct.* at 2355, 129 *L.Ed.*2d at 371 (quoting *Connecticut v. Barrett,* 479 *U.S.* 523, 528, 107 *S.Ct.* 828, 832, 93 *L.Ed.*2d 920, 928 (1987)). Therefore, the State concludes, "the [*Edwards* ] violation is indistinguishable from the errors ... regarding the administration of prophylactic *Miranda* procedures."

In sum, the State is requesting that the Court find that the failure scrupulously to honor a defendant's invocation of the *Miranda* right to counsel is a violation of *Miranda* 's ancillary rights rather than a violation of the Fifth Amendment itself. Therefore, the analysis should focus on whether the 6:00 p.m. statement was involuntary in fact or merely involuntary as a matter of law. *See Burris, supra,* 145 *N.J.* at 529, 679 *A.*2d 121 (citing *Hartley, supra,* 103 *N.J.* at 261, 511 *A.*2d 80) (distinguishing statements that are coerced "as a matter of law" from those coerced "as a matter of fact"). We need not reach this issue, however, because the trial court allowed the statement into evidence based on the more exacting "fruit of the poisonous tree" doctrine. Therefore, we decline to modify the two-tiered approach to the privilege against self-incrimination outlined in *Burris, supra.*

The trial court found that the cat had not been let out of the bag at 10:53 a.m., that the final statement "was a marked departure in terms of culpability from the earlier statement on that date," and that it was not provoked by any action on the part of the State. Defendant revealed his involvement in the crime in "bits and pieces" over the course of the day. With the additional information defendant obtained from the police, he was able to make an informed assessment whether to give another statement. *See Kennedy, supra,* 97 *N.J.* 278, 478 *A.*2d 723 (holding incriminating statement admissible even though it was made moments after the officers had responded to the defendant's question about what would happen if the defendant failed to make a statement and after the defendant's request for counsel).

The court found as intervening circumstances that defendant learned that murder charges had been filed against him and that Crystal and Helen had altered their statements to incriminate defendant. In addition, defendant was moved between the Ocean County Prosecutors Office, the site of the first statement, and the Woodbridge Police Station, where defendant gave his second statement.

Finally, the court found that although Detective Kerwin erred in not clarifying defendant's request for counsel at the time of the arrest and in interrogating defendant at 10:53 a.m., he did not then act purposefully or flagrantly. Rather, Kerwin simply did not believe defendant requested counsel. The court also noted that Kerwin did not attempt to question defendant after defendant's clear invocation of his rights at 12:50 p.m. "Had defendant not requested him, Kerwin would never have spoken to defendant again on January 23, 1993."

The trial court employed the proper analysis and reached the proper conclusions in evaluating the admissibility of defendant's statements. Therefore, we hold that: (1) a defendant's invocation of the right to remain silent or to counsel precludes further questioning by the police, even if such invocation occurs immediately after the defendant's arrest and prior to the onset of

interrogation; (2) defendant's call to his mother as he was being arrested for her to call his attorney was an invocation of his right to counsel, or, at a minimum, was an ambiguous request for counsel that required further clarification as a condition for further questioning; (3) defendant's 6:00 p.m. inquiry regarding the charges he was facing initiated contact with the police, and further interrogation of him was proper and admissible; and (4) defendant's 6:13 p.m. taped statement was not a fruit of the illegally obtained 10:53 a.m. statement.

## IV

*Did the trial court err in denying defendant's request for a definition of the term "accomplice" during the court's charge on own conduct?*

Defendant argues that the proofs at trial offered three scenarios for the jury to have considered. Chew could have been the actual killer of Theresa Bowman; he could have been a lookout in the hotel lobby and found Theresa killed by Joe, the drug dealer; or, because there was evidence he had tried to hire others to kill Theresa, there was a possibility that he had been involved in the planning of the murder but not the actual killing by the Kenny Rogers look-alike. In that case defendant would have been guilty of murder as an accomplice but not death-eligible since he would not have committed the crime by his own conduct. Defendant argues that the trial judge effectively removed this third possibility from the jury's consideration because of an inadequate "own conduct" charge.

When the issue of accomplice liability was first raised, defendant did not seek an accomplice charge. After consulting with the Appellate Section of the Public Defender's Office, however, Chew's attorney requested an accomplice charge in the definition of own conduct, noting "I don't know how to do the own conduct charge without the accomplice charge and that's why I'm asking [for] it." She argued to the court that there was evidence that another person, possibly the man seen by the chef, actually killed Theresa. That person could possibly have been hired by defendant although

there was no evidence that money had been exchanged. Defense counsel noted:

My concern is that the by your own conduct without explaining the accomplice charge to them, especially in light of the fact that it's not [defense counsel's] theory and he's not going to be speaking to the jury about that, I think they need to be told what an accomplice is.

The court, however, observed

when you ask for an accomplice charge, as I understand what you are asking for, what you want me to do is to tell the jury you can find Mr. Chew guilty as a principal or an accomplice.

Defense counsel, however, did not ask for an accomplice charge in connection with the murder charge. During the colloquy, the court stated:

What I'm having difficulty seeing is why you would want [the theory that Chew hired the Kenny Rogers look-alike] as a part of deciding whether he's guilty or not as opposed to dealing with it in the own conduct charge which is really what you're concerned about.

Defense counsel responded:

That is what I'm concerned about. That's absolutely true. I do not want that being charged an accomplice some other place in the charge and then thinking, focusing in on that. I want it as part of the own conduct charge, that's correct.

The court then stated that, "then I misunderstand what you're saying. I asked you before, I thought I asked you before whether you wanted the accomplice charge as part of the murder charge" so the jury could decide "whether [defendant was] guilty of murder as an accomplice." Defense counsel said, "I don't want that." The court stated, "Oh, I thought that's exactly what you wanted," to which defense counsel replied:

No. I never wanted that, and if I expressed myself badly on that, I'm sorry. My only concern is the by your own conduct charge and giving them more information about what an accomplice could be.

Defendant now claims that the court misinformed trial counsel as to the effect of an accomplice charge, specifically that defendant would be death-eligible if found guilty as an accomplice to murder. Counsel argues that the trial court erroneously reasoned that if the jury found that Chew did not kill Bowman but hired someone to do it—the man who resembled Kenny Rogers—the crime would still be death-eligible under the act. The court said:

That's not accomplice in the general accomplice liability or accomplice which would spare the defendant a death penalty verdict, that if a jury found that, that he hired someone to kill, that would be own conduct. So I'm not going to charge it. I don't think there is any factual basis whatsoever to charge it, and for the reason that to charge it under the hypothesis given to me by [defense counsel] would create a *State v. Marshall* situation which would put it, which would trigger off the death penalty phase anyway so the application is denied.

Thus, during its guilt-phase charge the court did not mention the term accomplice, but simply defined murder as purposefully or knowingly causing death or serious bodily injury resulting in death that did not occur in the heat of passion resulting from reasonable provocation.

The court correctly defined "own conduct":

A defendant commits a murder by his own conduct if he actively and directly participated in the murder, that is the infliction of the injuries from which the victim died. The state must prove beyond a reasonable doubt that the defendant's conduct ... was the direct and immediate cause of death ... [and] that the defendant was the person who actually committed the murder.... If you have a reasonable doubt as to whether the killing was by his own conduct, or if you are unable to reach a unanimous decision beyond a reasonable doubt as to whether the defendant committed the murder by his own conduct, that is a permissible final verdict on this issue. That would result in the imposition of a mandatory sentence for murder of at least thirty years in prison without parole.

Defense counsel again objected to the omission of an accomplice discussion in the explanation of the own-conduct charge. She explained that there was a possibility that Chew did not actually hire someone to kill Bowman but was nevertheless involved in the planning and commission of the murder. She suggested that Helen Borden may have been involved. Defendant claims that the jury was thus never told of the ramifications of accomplice liability in a case in which such a finding would have made the difference between life and death.

Of course, a charge on accomplice liability is absolutely necessary when the charge can mean the difference between life and death. A court may not deny a jury the mechanism to decide which of the two forms of murder charged has been proven, murder as a principal or murder as an accomplice when evidence is present for either form. *State v. Long*, 119 *N.J.* 439, 575 *A.*2d

435 (1990). A jury need not unanimously agree on the theory of liability as principal or accomplice in order to convict of murder. *State v. Brown,* 138 *N.J.* 481, 651 *A.*2d 19 (1994). But only a jury verdict that finds unanimously and beyond a reasonable doubt that the defendant committed the murder by his or her own conduct triggers the penalty phase. *State v. Moore,* 113 *N.J.* 239, 550 *A.*2d 117 (1988).

 It overstates the analysis to suggest that if Chew did not personally kill Bowman he would still be eligible for the death penalty because he must have hired someone else to commit the homicide. Accomplices to murder need not necessarily be paid to kill. *Brown, supra,* 138 *N.J.* 481, 651 *A.*2d 19 (killings committed by two unpaid accomplices). There are two distinct capital triggering devices: to kill by one's own conduct or to hire another to kill. The State proceeded on the basis that defendant committed the killing by his own conduct. Even if the jury believed that Chew did not kill Theresa but, rather, hired the Kenny Rogers look-alike, it could not find, without defendant's consent, the procuring factor without an indictment charging it. *See R.* 3:7-3 (requiring that capital murder indictments specify the triggering device, whether it be own conduct, procuring, or drug-related conduct).

The problem with defendant's argument, however, is that defendant did not ask the court to submit accomplice liability as one of the forms of murder the jury could consider in its verdict. Defendant attempted to walk a tightrope to freedom or a verdict of less than murder. Defense counsel did not wish to expose her client to a conviction of murder as an accomplice. Had Chew been an accomplice to the killing, there would have been no realistic way for the jury to return a manslaughter verdict. (The jury was charged on passion-provocation manslaughter.) Instead of seeking a charge on murder as an accomplice, defendant sought to read into the own-conduct definition the principles of vicarious liability.

■ Although largely mirroring the common-law distinction between principal and accomplice liability, the own-conduct concept "is simply irrelevant to the question of whether defendant is guilty of purposeful or knowing murder." *Gerald, supra,* 113 *N.J.* at 100, 549 *A.*2d 792. During guilt-phase proceedings,

> the jury first must determine whether defendant should be convicted of murder considering, where appropriate, principles of vicarious liability under *N.J.S.A.* 2C:2–6 [such as accomplice or conspiratorial liability]. Only after it has unanimously found defendant guilty of purposeful and knowing murder should the jury turn to the question of whether defendant committed the homicidal acts by his or her own conduct.
>
> [*Ibid.*]

With the exceptions of murder for hire or the "drug kingpin" (not charged here), a conviction based on a theory of vicarious liability cannot subject the defendant to death-penalty proceedings. The own-conduct provision "is not an element of the offense of murder. It is merely a triggering device for the death penalty phase of the trial." *Gerald, supra,* 113 *N.J.* at 99, 549 *A.*2d 792.

■ The own-conduct analysis requires a slightly different factual inquiry by a jury than the analysis of principal and accomplice liability. This is because a judgment must be made as to whether a defendant's participation in the homicidal act was qualitatively sufficient to make the defendant death eligible. For example, in *Gerald,* the defendant was one of several men involved in the beating of an elderly person. We there held that the "own conduct" language

> does not necessitate a specific finding that the defendant's actions standing alone caused the victim's death. The relevant inquiry is whether or not the defendant actively and directly participated in the homicidal act, i.e., in the infliction of the injuries from which the victim died. The critical elements are that [the] defendant in fact acted, and the immediacy of his conduct to the victim's demise.
>
> [*Id.* at 97, 549 *A.*2d 792.]

■ There was thus an element of unfairness in the way in which defendant sought to have the court instruct the jury. It would have been unfair to the State to deny the jury the opportunity to convict defendant of murder as an accomplice but then to have the jury consider accomplice liability only in the triggering phase. In a sense, defendant's suggestion presents the converse

of *State v. Purnell,* 126 *N.J.* 518, 601 *A.*2d 175 (1992). We there held that a penalty-phase jury could not consider a theory of death eligibility (murder in the course of a felony) without permitting the jury in the guilt phase to consider a non-capital verdict on that basis.

It is true

that the public interest may require that a particular charge be given to the jury, where the facts rationally support such a charge, even though neither the defense nor the prosecution has requested it; that enforcement of the criminal law is too important to be controlled completely by the contentions of the adversaries; and that the court has an obligation to see to it that the jury, as the representative of the public, is given all of the facts *and* all of the possible offenses that might reasonably be found from such facts.

[*State v. Choice,* 98 *N.J.* 295, 298–99, 486 *A.*2d 833 (1985).]

However, the duty of the trial court to charge on any possible offense arises only when the facts "clearly indicate" the appropriateness of that charge, *id.* at 298, 511 *A.*2d 80, and when the instruction does not conflict with a defendant's trial strategy.

While the public interest in giving the jury all of the facts and the option to choose from all of the consequent possible offenses may prevail over counsel's interest . . ., that may not be the case where the injection of that [unrequested] issue by the court will enhance the risk of a murder conviction.

[*Id.* at 300–01, 511 *A.*2d 80.]

The trial court did not mislead defense counsel. The colloquy concerning defendant's death eligibility if he had hired a killer came at the end, not the beginning of the process. Defendant's charge request came late in the trial and the communications between the Appellate Section and trial counsel may have missed something in the translation. The court was always prepared to give a straight accomplice charge. It was the request to incorporate the accomplice charge in the own-conduct charge that caused the problem. Ultimately, the trial court reasoned that even if there were a scenario of accomplice liability,

[t]he other [answer] is that the charge itself on own conduct is abundantly clear that in order to find the defendant committed a murder by his own conduct, he's got to be the one that actually killed her. I say that in my charge. I don't know how much more you would want. All the accomplice thing would do would be first

of all to introduce some theory that has no factual basis and serve to confuse the jury.

It may be argued now that it was ineffective assistance on the part of trial counsel to have sought the instruction that she did. Without barring a later ineffective assistance claim, we are satisfied that under the second prong of the *Strickland/Fritz* test there is not a reasonable probability that these deficiencies materially contributed to defendant's conviction. *State v. Fritz*, 105 *N.J.* 42, 58, 519 *A.2d* 336 (1987).[11]

Only the most generous interpretation of this record would provide a rational basis for an accomplice charge. The State argues that only under the "most bizarre patchwork of facts" could defendant have been found to be on the periphery of this crime. His sister placed him at the scene of the crime with blood on his clothes. How he and another could have gotten into the Corvette with Theresa is not easily explained.

In *State v. Biegenwald*, we held that the failure to instruct the jury on accomplice liability, when neither that theory nor facts supporting it were ever put before the jury, was not error. 126 *N.J.* 1, 19, 594 *A.2d* 172 (1991). So too, in this case, we are satisfied that defendant suffered no prejudice at the trial. The court clearly explained to the jury in connection with the own-conduct charge that it must unanimously find beyond a reasonable doubt that defendant alone had committed the crime. The jury was thus clearly informed, and its verdict sheet indicated, that a less than unanimous verdict on that point would have entitled defendant to a life sentence.

---

11 In *Fritz*, we adopted the two-part test set forth in *Strickland v. Washington*, 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.2d* 674 (1984). To prove ineffective assistance of counsel, a defendant must first show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that counsel's deficient performance prejudiced the defendant, and was so serious as to deprive the defendant of a fair trial. *Fritz, supra,* 105 *N.J.* at 52, 519 *A.2d* 336.

# V

## Other Errors Claimed

### A.

#### Admission of Prior Consistent Statements

 Defendant argues that the January 23 statements of Helen Borden and Crystal Charette should not have been admitted in evidence. Although prior consistent statements may be admitted to rebut a charge of recent fabrication or motive to lie, defendant argues that those statements would not have been admitted because the witnesses' motivation to lie was present at the time they made the prior statements. As noted, their original statements gave defendant an alibi. On January 23, however, they both provided statements, largely consistent with their trial testimony, that inculpated defendant. Anticipating an attack on the credibility of Helen and Crystal, the prosecutor said that he intended to offer on redirect their prior consistent statements pursuant to *N.J.R.E.* 803(a)(2).

Defense counsel objected to the introduction of the prior consistent statements citing federal case law for the proposition that "if the motive to falsify existed at the time the statement was given in addition to the time of testifying, then there's no probative value to allowing that original statement to come in."[12] New Jersey's *Rule of Evidence* 803(a)(2) is based on the federal rule. Defense counsel sought an immediate ruling to determine the scope of the cross-examination. The trial court refused to rule in advance.

Both Helen and Crystal testified on direct examination in accordance with their statements of January 23. Each stated that she initially had given false information to the police. After cross-examination concerning their motives and about the "deals" that

---

[12] Defendant also argues that the impact of the prior consistent statements was compounded by the fact that the jury heard new information. The few new facts that emerged from the statements, however, were not so compelling as to constitute anything but harmless error.

they have made (Helen faced ten years with up to five years of parole ineligibility on other offenses and Crystal had been promised a non-custodial sentence), the prosecutor moved to admit the prior consistent statements. The trial court ruled that the statements were admissible.

Defendant now relies on the subsequent ruling in *Tome v. United States*, 513 *U.S.* 150, 115 *S.Ct.* 696, 130 *L.Ed.*2d 574 (1995), to confirm his theory. *Tome* held that *Federal Rule of Evidence* 801(d)(1)(B) "permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive only when those statements were made before the charged recent fabrication or improper influence or motive." *Id.* at 165, 115 *S.Ct.* at 705, 130 *L.Ed.*2d at 588.

New Jersey's previous rule on the admissibility of prior consistent statements was contained in *Evid. R.* 20, which stated that "[a] prior consistent statement shall not be admitted to support the credibility of a witness except to rebut an express or implied charge against [the witness] of recent fabrication. . . ." Effective July 1, 1993, New Jersey's *Rule* 20 was replaced by a new rule that mirrored federal *Rule* 801(d)(1)(B).[13] The new *Rule* provides, in pertinent part, that:

> The following statements are not excluded by the hearsay rule:
>
> (a) . . . A statement previously made by a person who is a witness at a trial or hearing, provided it would have been admissible if made by the declarant while testifying and the statement:
>
> \* \* \* \* \* \* \* \*
>
> (2) is consistent with the witness' testimony and is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive. . . .
>
> [*N.J.R.E.* 803(a)(2).]

In his commentary accompanying the evidence rules, Richard Biunno stated:

---

[13] The federal rule excludes prior consistent statements from the hearsay definition. *Fed.R.Evid.* 801(d). The New Jersey *Rule* treats such statements as hearsay, but as falling within an exception. *N.J.R.E.* 803(a).

*N.J.R.E. 803(a)(2)* follows Fed.R.Evid. 801(d)(1)(B) and has no analogue in prior New Jersey rules governing hearsay exceptions, although it is related to the common law exception for "fresh complaint".... It was adopted in order to allow the use as substantive evidence of those prior statements of a witness which would be admissible also under *N.J.R.E.* 607 purely on the issue of credibility, that is, to rehabilitate a witness if his or her credibility was attacked.

[Biunno, *N.J. Rules of Evidence*, comment 2 on *N.J.R.E.* 803(a)(2) (1995).]

*State v. Johnson*, 235 *N.J.Super.* 547, 556, 563 *A.*2d 851 (App. Div.), *certif. denied*, 118 *N.J.* 214, 570 *A.*2d 971 (1989), suggested that the predecessor *Rule* 20 was interpreted as *not* to contain a temporal requirement "that a party seeking admission of a prior consistent statement show that the prior statement was made before any alleged motive to falsify existed on the part of the declarant."

The *Tome* majority gives the history:

The prevailing common-law rule for more than a century before adoption of the Federal Rules of Evidence was that a prior consistent statement introduced to rebut a charge of recent fabrication or improper influence or motive was admissible if the statement had been made before the alleged fabrication, influence, or motive came into being, but it was inadmissible if made afterwards. As Justice Story explained: "[W]here the testimony is assailed as a fabrication of a recent date ... in order to repel such imputation, proof of the antecedent declaration of the party may be admitted." *Ellicott v. Pearl*, 35 *U.S.* (10 Pet.) 412, 439, 9 *L.Ed.* 475 (1836). *See also People v. Singer*, 300 *N.Y.* 120, 124–125, 89 *N.E.*2d 710, 712 (1949).

McCormick and Wigmore stated the rule in a more categorical manner: "[T]he applicable principle is that the prior consistent statement has no relevancy to refute the charge unless the consistent statement was made before the source of the bias, interest, influence or incapacity originated." E. Cleary, McCormick on Evidence § 49, p. 105 (2d ed.1972) (hereafter McCormick). *See also* 4 J. Wigmore, Evidence § 1128, p. 268 (J. Chadbourn rev. 1972) ... ("A consistent statement, at a time prior to the existence of a fact said to indicate bias ... will effectively explain away the force of the impeaching evidence" (emphasis in original)). The question is whether Rule 801(d)(1)(B) embodies this temporal requirement. We hold that it does.

[*Tome, supra*, 513 *U.S.* at 156, 115 *S.Ct.* at 700, 130 *L.Ed.*2d at 581.]

*Tome* rejected the alternative statement-by-statement balancing approach suggested by its four dissenting members:

The statement-by-statement balancing approach ... creates the precise dangers the Advisory Committee noted and sought to avoid: It involves considerable judicial discretion; it reduces predictability; and it enhances the difficulties of trial preparation because parties will have difficulty knowing in advance whether or not particular out-of-court statements will be admitted.

[*Id.* at 165, 115 *S.Ct.* at 704–05, 130 *L.Ed.*2d at 581.]

The *Tome* majority reasoned that to be logically relevant to rebut a charge of testifying while under an improper influence or motive, a prior consistent statement must have been made before the point at which the story was fabricated or the improper motive or influence arose. Otherwise, the prior statement does nothing to rebut the charge. "Mere repeated telling of the same story is not relevant to whether the story, when told at trial is true." Major Patrick D. O'Hare, *From Toro to Tome: Developments in the Timing Requirements for Substantive Use of Prior Consistent Statements,* 1995 *Army Law.* 21, 25.

Our law has reflected some of the same reasoning:

> The rule permitting extra-judicial, consistent statements of a witness is an unusual one; it should be applied with caution. . . . Otherwise a witness' credibility will depend more upon the number of times he has repeated the same story than upon the truth of the story itself.
>
> [*State v. Griffin,* 19 *N.J.Super.* 581, 587–88, 89 *A.*2d 67 (App.Div.1952) (internal quotations and citation omitted).]

However, in this case, many things were happening as the different stories unfolded. There were shades of difference between the witnesses' motivation at different times.

It is true that on January 23, both Helen and Crystal were well aware that they were potentially facing murder and obstruction charges. Immediately prior to the statements being made both women were told that they could be facing thirty years' incarceration. Helen also had a pending theft charge. However, cross-examination tested whether the witnesses were further motivated by their plea agreements and whether the police had fed them with the details of their stories.

Given that the jury had heard the witnesses' original stories, a limited use of these prior consistent statements surely ought to have been permissible to rehabilitate the witnesses. Federal *Rule of Evidence* 801(d)(1)(B) does not abolish the nonsubstantive use of prior consistent statements. It has been suggested that prior consistent statements that do not satisfy the requirements of *Rule* 801(d)(1)(B) still may be used for rehabilitation, but not for their

truth. Edward J. Imwinkelried, *Evidentiary Distinctions, Understanding the Federal Rules of Evidence* 139 (1993). New Jersey continues the common-law use of prior consistent statements to support the credibility of the witness. *N.J.R.E.* 607.

This is not the case in which to plumb the nuances between the substantive and supportive uses of prior consistent statements. Given the relationship among the several statements, the court did not err in admitting the January 23 statements. The prior consistent statements had significant "probative force bearing on credibility beyond merely showing repetition." *United States v. Pierre*, 781 *F*.2d 329, 333 (2d Cir.1986). In fact, defendant was able to impeach the witnesses through the admission of the January 23 statements. The jurors heard that Helen and Crystal had first given exculpating statements and later had changed their stories. The jury also heard evidence of the different motives that they might have had for changing their stories. Defendant was able to argue that the witnesses' fear of thirty years' confinement was a reason not to give much weight to the women's statements. Finally, defendant highlighted numerous inconsistencies between the witnesses' statements, and between the different versions of the statements that the witnesses provided.

Because of the independent bases for admitting the prior consistent statements (the differing motives to fabricate and the rehabilitative use of the evidence), we need not resolve whether *N.J.R.E.* 803(a)(2) contains the temporal requirement of the federal rule. We request that our Committee on the Rules of Evidence review the current formulation of the Rule to determine whether any change need be made.

### B.

#### Jury Charge Regarding Defendant's Statement

Defendant argues that the trial court's failure to instruct the jury that the State had to prove the credibility of defendant's statement beyond a reasonable doubt had the clear

capacity to bring about an unjust result, thus requiring a reversal of his conviction. Because defendant did not object to the challenged instruction he has waived any challenge to the instruction on appeal. *R.* 1:7–2. This Court may reverse only if it finds "plain error." *R.* 2:10–2. Under federal plain error review, defendant has the burden to show that there is an error, that the error is "clear" or "obvious," and that the error has affected "substantial rights." *United States v. Olano,* 507 *U.S.* 725, 734, 113 *S.Ct.* 1770, 1777, 123 *L.Ed.*2d 508, 519 (1993). Our law is the same. In *State v. Jordan,* 147 *N.J.* 409, 688 *A.*2d 97 (1997), we stated that in considering a jury charge, plain error is

[I]legal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.

[*Id.* at 422, 688 *A.*2d 97 (citations omitted).]

■ At trial, defendant asked that the court instruct the jury as required by *State v. Hampton,* 61 *N.J.* 250, 272, 294 *A.*2d 23 (1972). The court gave the model jury charge created in response to *Hampton.* In *Hampton,* this Court held that it is for the trial court to determine the admissibility and voluntariness of a statement, considering the precepts of *Miranda.* However, the Court also instructed courts that if the statements were found legally admissible, juries still had to be provided with the opportunity to reject the credibility of those statements. The *Hampton* rule was codified in former *Evid. R.* 8(3), now *N.J.R.E.* 104(c). The *Rule,* in pertinent part, directs that: "[i]f the judge admits the statement the jury shall not be informed of the finding that the statement is admissible but shall be instructed to disregard the statement if it finds that it is not credible." *N.J.R.E.* 104(c). In *Jordan, supra,* we reaffirmed the *Hampton* rule, although we noted that a failure without objection, to give a *Hampton* charge is not *per se* reversible error.

Defendant received a *Hampton* charge. He asks now for a rule that the State must establish beyond a reasonable doubt the credibility of a defendant's statement. *Hampton* does not require

that the State carry such a burden. The principle could be counterproductive to a defendant. In this case the defendant's statement was partially exculpatory. He never admitted to knowing or purposeful murder of Theresa. It would be anomalous to require the State to prove beyond a reasonable doubt the truthfulness of that part of the statement.

In *State v. Bowman*, 165 *N.J.Super.* 531, 398 *A.*2d 908 (App.Div. 1979), the court had reasoned that a jury should be told that the State must establish the credibility of conflicting statements beyond a reasonable doubt. However, in *State v. Jordan*, 285 *N.J.Super.* 589, 667 *A.*2d 1094 (1995), *aff'd*, 147 *N.J.* 409, 688 *A.*2d 97 (1997), the Appellate Division rejected the *Bowman* suggestion, reasoning that even the *Hampton* charge was dispensable when the State offered two conflicting statements because "[t]he jury had to know and understand that they would have to decide which of these versions was credible." 285 *N.J.Super.* at 595, 667 *A.*2d 1094. We thus reject defendant's argument.

## C.

### Prosecutorial Misconduct

■ Defendant maintains that the prosecutor's conduct deprived him of a fair trial. He argues that the prosecutor repeatedly personalized his argument, offering opinions on the evidence as well as on the credibility of both witnesses and arguments. Defendant also argues that the prosecutor argued facts not in evidence.

The State's summation contains many references to the prosecutor's personal beliefs. "I find that very hard to believe." "I think the entire story about selling a large amount of cocaine was concocted out of thin air." The prosecutor also provided the jury with his impressions of some of the witnesses. He described George Tilton as being "aggressive" and having a "chip on his shoulder," and defendant's son Robert Chew as "[n]ot very smart except in the ways of the street perhaps."

The prosecutor also discussed cuts on defendant's hands, with little evident support in the record, saying "[w]ell, as [defendant] yanks her hair, his hand is pretty close to her neck and there's still some struggling going on."

Defendant also complains that the prosecutor called him a liar during his summation. The prosecutor said: "[Y]ou have someone as clever as John Chew, someone who thinks about all these things, someone who plants facts, someone who suggests defenses, someone who creates evidence."

We are satisfied that the improprieties defendant asserts were not of such a nature as to deprive defendant of a fair trial. Although generally limited to commenting on the evidence and to drawing reasonable inferences that are supported by the proofs, a prosecutor may nonetheless make a "vigorous and forceful presentation of the State's case." *State v. Bucanis,* 26 *N.J.* 45, 56, 138 *A.*2d 739, *cert. denied,* 357 *U.S.* 910, 78 *S.Ct.* 1157, 2 *L.Ed.*2d 1160 (1958). The Court will afford a prosecutor "considerable leeway, within limits, in making" closing argument. *Purnell, supra,* 126 *N.J.* at 540, 601 *A.*2d 175. "[C]omments by way of denunciation or appeal, will afford no grounds for reversal if merely descriptive of the proofs adduced at trial." *State v. Marks,* 201 *N.J.Super.* 514, 534, 493 *A.*2d 596 (App.Div.1985), *certif. denied,* 102 *N.J.* 393, 508 *A.*2d 253 (1986). Misconduct by a prosecutor does not constitute reversible error unless it was such that it deprived defendant of a fair trial. Factors to consider when analyzing prosecutorial conduct include whether defense counsel made a timely and proper objection, whether the remark was withdrawn promptly, and whether the court gave a limiting instruction. *State v. Zola,* 112 *N.J.* 384, 426, 548 *A.*2d 1022 (1988), *cert. denied,* 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989).

In each instance cited by defendant, the prosecutor's comments were sufficiently related to the scope of the evidence before the jury. Moreover, when requested, the trial court gave prompt curative instructions.

## D.

### State's Burden To Rebut Mitigating Factors

Defendant argues that the trial court failed properly to allocate the burden of proof on the finding of mitigating factors. The court correctly informed the jury that defendant bore the burden to come forward with evidence of mitigating factors, but did not instruct the jury that the State bore the "actual burden of *disproving* such a factor" once the defendant has introduced competent evidence of its existence.

Except for factors such as "no prior record," we have consistently held that "[t]he jury's determination of whether matters in evidence constitute mitigating factors is the result of a qualitative judgment." *Zola, supra,* 112 *N.J.* at 438, 548 *A.2d* 1022. The *Zola* Court gave as an example that "although [the] defendant [in *Bey* ] was of the youngest age that could be subjected to the death penalty, the jury failed to find his youth a mitigating factor." *Ibid.* (citing *Bey II, supra,* 112 *N.J.* at 149, 548 *A.2d* 887). We do not believe a jury should be instructed that it must find a statutory mitigating factor for which there is reliable evidence unless the State has disproved it. *State v. Harris,* 141 *N.J.* 525, 567, 662 *A.2d* 333 (1995). A jury certainly should consider all reliable evidence in assessing whether a factor is present and determine the weight to which the factor is entitled. But whether the evidence meets the statutory definition of a mitigating factor is a matter for the jury.

## E.

### Weighing of Mitigating Factors

After failing to object below, defendant argues that the court neglected to inform the jurors that each of them must individually consider and weigh all mitigating factors that he or she found present even if the other jurors did not find that factor present. The State argues that the jurors understood their duty

and that defendant's right to a fair sentencing proceeding was not jeopardized.

The court instructed the jurors at the conclusion of the penalty phase that they must weigh mitigating factors against aggravating factors. The court emphasized that

[i]f there is reliable evidence of a mitigating factor, you must consider that evidence, and give it such weight as you deem appropriate. In other words, if any evidence has been presented, with respect to a mitigating factor, and you find the mitigating factor to be present, you are bound by the law, to consider it, and weigh it, against the aggravating factors you found to be proved.

Defendant argues that the charge indicated that individual jurors need only balance mitigating factors that *jurors* (plural) found to be present:

To the extent reasonably possible, you should attempt to reach agreement on the question of whether a particular mitigating factor does or does not exist. However, unlike aggravating factors, the law does not require unanimity with respect to the finding of mitigating factors. Rather each juror must individually determine whether or not such mitigating factor exists. In the weighing process, each juror must individually decide whether the aggravating factor unanimously outweighs, beyond a reasonable doubt, the mitigating factor or factors *that the jurors found to be present.*

[Emphasis added.]

However, the court later instructed the jurors on recording their votes and correctly reminded the jurors that they need not be unanimous about the mitigating factors or even have a majority vote:

If, after a full discussion, you find that you are not unanimous on the existence or non-existence of a mitigating factor, you will record your last vote on the factor on the verdict form. That is, in the boxes, the number of "yes" or "no" votes. However, remember whether a mitigating factor exists is not decided by a majority vote. As long as one juror finds any credible evidence, of any mitigating factor, you'll check, "yes," next to that factor.

\* \* \* \* \* \* \* \*

As long as any juror finds evidence of a mitigating factor, "yes" must be checked next to the factor.

\* \* \* \* \* \* \* \*

If one person feels that there is evidence, credible evidence, of that mitigating factor, check "yes."

In recapping, the court stated that "[i]n the weighing process, you will weigh the aggravating factor, which you found unanimously, against the mitigating factors that you have found."

Although not as clear as it could have been, the charge and the verdict sheet, taken in their entirety, informed the jurors that they need not be unanimous on the finding or balancing of mitigating factors. In fact, the jury verdict sheet meticulously recorded individual votes on the mitigating factors alleged.

### F.

#### Testimony of County Medical Examiner

Defendant argues he was "ambushed" by the testimony of the County Medical Examiner regarding certain crisscross scratches found on Theresa's face. Prior to trial, defense counsel had obtained the medical examiner's report, which described all of the victim's wounds. Shortly before trial, the prosecution informed defense counsel and the court that the medical examiner would testify that it was his opinion that the scratches were "deliberately made," perhaps while Ms. Bowman was restrained or immobile. Defendant objected. Defendant asserts he was given no opportunity to *voir dire* potential jurors on their attitude toward the manner of Ms. Bowman's death or to attack the medical examiner's credibility. The court ordered that the medical examiner not mention the word "torture," because that factor was not charged.

At trial, the medical examiner was allowed to testify to the scratches in the course of describing the victim's wounds. The medical examiner testified that in his opinion the crisscross scratches were made while Ms. Bowman was "either restrained or certainly not moving ... [and] were deliberate."

We find no error in allowing the testimony. The crisscross wounds were visible in the photographs of the victim that were shown to the jury. To have omitted mention of the wounds may have confused the jury. We find that the court properly instruct-

ed the jurors on their responsibility to exclude consideration of the manner of Ms. Bowman's death from their penalty-phase deliberations.

## VI

### Constitutionality of the Death Penalty

 For completeness of the record, we note and preserve defendant's challenge to the proportionality of his death sentence and his assertion that the New Jersey death-penalty statute violates the Eighth Amendment. Defendant argues that the statute fails to define narrowly the class of death-eligible persons and fails to provide a system of meaningful appellate review.

Following proportionality review, we shall consider this challenge to his sentence. With respect to defendant's challenge to the constitutionality of the death-penalty statute, we adhere to our decision in *Ramseur, supra,* 106 *N.J.* at 190, 524 *A.*2d 188, where we rejected arguments that the statute violated the Eighth Amendment of the United States Constitution or Article 1, paragraph 12 of the New Jersey Constitution.

## VII

We affirm defendant's convictions. We also affirm his sentence of death.

HANDLER, J., dissenting.

Defendant John Chew was charged with and convicted of the purposeful-or-knowing murder of Theresa Bowman. He was sentenced to death because he was found to have killed Bowman in the expectation of the receipt of something of pecuniary value. The basis for that determination was that he was named as the beneficiary of a life-insurance policy held by Bowman. Individual jurors found each of the ten mitigating circumstances establishing the existence of the so-called catch-all mitigating factor. Nevertheless, the jury unanimously and beyond a reasonable doubt

found that the single aggravating factor outweighed all of the mitigating factors, and sentenced defendant to death.

In sustaining this death sentence, the Court engages in puzzling reasoning—it first gives the sole aggravating factor a patently over-broad and vague interpretation, and then, even though it determines that limitations must be imposed on its interpretation in order to validate application of the aggravating factor, it does not limit that application in this case. Moreover, the Court ignores the fact that the jury was not instructed about the factor in accordance with the Court's own definition. Under the Court's analysis, the jury instructions were clearly erroneous, and the jury's misguided findings cannot possibly support the death sentence that was imposed. I dissent from the Court's conclusion in that regard.

I dissent as well from other determinations relied on by the Court to sustain defendant's murder conviction and death sentence. The jury determined that defendant was death-eligible in that he killed Bowman by his own conduct. I believe that the death sentence must be vacated because the trial court failed to provide an accomplice instruction as part of the charge that explained the own-conduct requirement. Furthermore, I find reversible error in the admission of the prior consistent statements of two important witnesses.

I

The State relied on a single aggravating factor to obtain a death sentence in this case—that "[t]he defendant committed the murder as consideration for the receipt, or in expectation of the receipt of anything of pecuniary value...." *N.J.S.A.* 2C:11–3 c(4)(d). It also relied on a single fact to establish that aggravating factor—that defendant was the beneficiary of an insurance policy on the victim's life. The issue thus raised is whether that statutory factor applies to a defendant who commits murder for insurance proceeds. Related to that issue is whether the jury was

properly instructed in its consideration and application of the factor.

A.

The statutory language that defines the relevant aggravating factor makes a person death-eligible under two circumstances. It does so first if he commits a murder as "consideration for the receipt ... of anything of pecuniary value...." *Ibid.* Clearly, that language read sensibly and accurately expresses a meaning that the mere receipt of an item of pecuniary value is not sufficient. Rather, the language imports the requirement that the murder be in "consideration" of that receipt. Consideration is a term that comes with an established and well-understood meaning. It is a contract term that denotes "[t]he inducement to a contract." *Black's Law Dictionary* 277 (5th ed. rev.1979). Consideration can be the "cause, motive, price, or impelling influence which induces a contracting party to enter into a contract." *Ibid.* Consideration, however, cannot be equated solely with the motive or purpose of an actor; it is more than simply the reason that one acts. Rather, consideration entails a mutual understanding between two persons; in contract parlance, it requires a meeting of the minds between the promisee and the promisor. *See* E. Allan Farnsworth, *Contracts,* § 1.6 (1982) (noting that the concept of consideration developed from a *quid pro quo* exchange); Richard A. Lord, *Williston on Contracts,* § 7.2 (4th ed.1992) (defining consideration as a bargained-for exchange); Joseph M. Perillo & Helen H. Bender, *Corbin on Contracts,* § 5.1 (rev. ed.1995) (refusing to define consideration but noting that it entails a type of mutuality of exchange). Thus, for a murder to be undertaken "as consideration for the receipt ... of anything of pecuniary value," the murderer must have a mutual understanding and a meeting of the minds with another person. In other words, the murderer must be hired by another for the purpose of committing the offense. *See State v. Clausell,* 121 *N.J.* 298, 344, 580 *A.*2d 221 (1990) ("The essence of c(4)(d) is that the murder was committed *in exchange*

for something of value.") (emphasis added); *cf. State v. DiFrisco,* 137 *N.J.* 434, 645 *A.*2d 734 (1994) (*DiFrisco II* ) (upholding death sentence under c(4)(d) factor where murderer, pursuant to an agreement, was paid to kill victim), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996).

The statutory factor also makes a person death-eligible if a murder is committed "in *expectation* of the receipt of anything of pecuniary value . . . ." *N.J.S.A.* 2C:11–3 c(4)(d). The expectation of receipt similarly requires a meeting of the minds between two persons. The basis for that interpretation of the statutory factor is that "consideration" modifies both an actual receipt as well as an anticipated or expected future receipt of anything of value. Thus, the central meaning of this aggravating factor is that it requires a contractual arrangement, including an agreement and a mutual understanding, between the murderer—the "contract killer"—and the principal. Reflecting that essential meaning, the statute accommodates both a past (or present) receipt and a future or prospective receipt of something of pecuniary value.

This Court's own decisions confirm that understanding. In *Clausell, supra,* we made clear that the aggravating factor encompasses both the arranged completed receipt *and* the expectation of the receipt of payment. 121 *N.J.* at 344, 580 *A.*2d 221 ("On remand, if necessary, the court should expand that statement [of the c(4)(d) factor] by telling the jury that it must specifically find that defendant either received payment, or expected to receive payment, for having killed . . . .").

The majority refuses to read "consideration" as modifying anything but the first clause of the statutory factor. To reach that result, it finds "[t]he two clauses [to be] distinct." *Ante* at 54, 695 *A.*2d at 1313. The first clause, according to the majority, requires "consideration and therefore involves a contractual arrangement between the murderer and another acting in concert," but the second clause, the majority insists, dispenses with "consideration" and allows a death-eligible murder to be committed by the mur-

derer acting alone with only the "expectation" of obtaining something of value. *Ibid.*

The difficulty with the Court's interpretation of the second clause is that it would wholly encompass the scope of the first clause, thus rendering the first clause nugatory. That is because one's "expectation of receipt" could include both a future, present, or past expectation. It also could involve an "expectation" based on a contractual arrangement. More troublesome is that under the Court's interpretation, all robbery or burglary murders and any murder where the defendant had obtained, planned to obtain, or thought he might obtain any financial benefit, no matter how slight or immaterial to the defendant's actions, would become death-eligible. Recognizing that such an expansion would be virtually limitless, the majority then endeavors to limit the factor of "expectation." Nevertheless, under its initial and basic interpretation, those types of cases on their face would be death-eligible. Its limiting of the factor comes not from the statutory language or the legislative history but from its own apprehension of constitutional constraints that, under the Court's interpretation, clearly would invalidate the statutory factor on overbreadth grounds.

The Court's interpretative route is tortuous and begs the obvious issue of whether the plain language of the statute, based on common understanding, engenders an interpretation that is both reasonable and constitutional. The sensible and appropriate interpretation of the second clause is one that makes death-eligible a defendant who "committed the murder as consideration for" either the past or current receipt of something of value or for the "expectation of the receipt of anything of pecuniary value," that is, of the future receipt of anything of pecuniary value. In other words, the statutory language, in accordance with its sensible, if not plain, meaning denotes that it covers those killings in which two persons corruptly have agreed for money or its equivalent to have a murder committed, the payoff occurring either before or after the murder.

Viewing the c(4)(d) aggravating factor in its statutory context, particularly in relation to other aggravating factors, further underscores the flaws in the Court's interpretation. First, every other aggravating factor contains only one core element that renders a murder conviction death-eligible. The majority's conclusion that the two clauses of the c(4)(d) factor are "distinct" means that this statutory aggravating factor, unlike any other, is in reality two factors containing two separate triggering mechanisms with dual standards.

Further, the c(4)(d) factor read in conjunction with the c(4)(e) aggravating factor highlights the deficiency of the Court's construction. The c(4)(e) factor makes death-eligible those defendants who "procured the commission of the offense by payment or promise of payment of anything of pecuniary value...." *N.J.S.A.* 2C:11-3 c(4)(e). Thus, the c(4)(d) factor encompasses the person hired to kill—the actual killer—while the c(4)(e) factor encompasses the person who hires the killer—the principal. *Cf. State v. Marshall,* 123 *N.J.* 1, 586 *A.*2d 85 (1991) (upholding death sentence of hirer under the c(4)(e) factor) (*Marshall I* ), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993). And, like the *receipt* of pecuniary value expressed in c(4)(d), the delivery or *payment* of pecuniary value provided in c(4)(e) can be either past or future—occurring before or after the murder. Further, like the requirement of "consideration" included in c(4)(d), the exchange contemplated in c(4)(e) entails an agreed-upon, arranged "consideration" covering either a payment already made before the murder or one to be made after the murder. The statutory scheme is thus clear and straightforward. Together the two factors include each party to the murder contract. The killer can be paid by his principal before or after the killing; the principal who hires the killer likewise can arrange for payment before or after the killing. Common to both is the "hire." The obvious symmetry of that structure is destroyed by the Court's expansive interpretation of the c(4)(d) factor.

In addition, the meaning of this aggravating factor is elucidated by the basic definition of what constitutes a death-eligible murder. Subsection "c" defines a capital murder as one committed by a purposeful-or-knowing murderer "who committed the homicidal act by his [or her] own conduct," which clearly includes a murderer who is hired to kill the victim and who does so as contemplated by the aggravating c(4)(d). Subsection "c" also renders death-eligible a murder committed by one "who as an accomplice procured the commission of the offense by payment or promise of payment of anything of pecuniary value." *N.J.S.A.* 2C:11-3 c. The "payment or promise of payment of anything of pecuniary value" parallels the c(4)(e) aggravating factor for a murder committed by one who hires—procures—the murder and arranges to pay for the murder either before or after it occurs. The statutory definitions of a death-eligible murder thus replicate the definitions of the murders that are aggravated because they are contract murders. This statutory scheme reinforces the understanding that the second part of the statutory c(4)(d) requirement of "consideration," which imports the "expectation" of something of pecuniary value, entails the "promise of [its] payment."

The legislative history of both the statutory factor and the death-penalty act further supports the conclusion that murders that are distinctive because they are based on financial gain or reward must be essentially contractual in nature in order to be death-eligible. The history of the specific language of the act, *L.* 1982, *c.* 111, is quite sparse. *See* John J. Farmer, Jr., *The Evolution of Death–Eligibility in New Jersey*, 26 *Seton Hall L.Rev.* 1548, 1569 (1996) (noting that the debate in the Legislature focused largely on whether to adopt capital punishment, not on either the structure or the interpretation of the act). Despite the absence of an extensive history, however, all of the relevant background contradicts the Court's interpretation. For example, in the only public hearing on the bill, the sponsor, Senator Russo, noted that the c(4)(d) factor "is the murder for hire" factor. *Public Hearing Before Senate Judiciary Committee on Senate 112 (Death Penalty)*, at 14 (Feb. 26, 1982) ("*Hearings on S. 112* ").

Edward H. Stier, the lawyer at the Attorney General's office who helped draft the bill, agreed. *Ibid.* Although the Court labels that reference to the factor as a mere "verbal shorthand," *ante* at 55, 695 *A.*2d at 1314, the exchange nevertheless is a significant clue in determining legislative intent.

Furthermore, the act's legislative history in general demonstrates that the drafters intended it to be very narrow in its implications. Senator Russo made that abundantly clear:

> Basically, the bill is drafted in accordance with the United States Supreme Court guidelines that render capital punishment constitutional in the Supreme Court case [*Gregg*] that so declared. It follows somewhat the form of legislation that has been passed reinstating the death penalty in some 35 states. However, it is probably stricter in a number of instances that I will point out as we go along.... It is stricter in the sense that it is not as broad as the legislation in many states. It does not cover as many people as some of the other legislation does.
>
> [*Hearings on S. 112, supra,* at 1.]
>
> ... My purpose as sponsor is that this bill apply only to two categories, not that it couldn't perhaps be justified to more, but I want to limit it to two categories and always have.... I don't make the argument by that that others should not be subjected to the death penalty. I just don't want to go that far at this time. You know, you can really make an argument to extend to many people.... I, as sponsor, do not want to go any further than that at this time.
>
> [*Id.* at 17.]
>
> If some people escape the death penalty under this legislation, that doesn't bother me. What I am worried about is if somebody gets it that perhaps shouldn't.
>
> [*Id.* at 18.]

Thus, Senator Russo made clear that the New Jersey statute was meant to be narrow in scope. The Court's initial interpretation of the c(4)(d) factor—that it applies to all persons who kill for monetary gain—is sharply discordant with that intent, because most murderers kill for some kind of monetary gain, but clearly the death penalty was not intended to apply to most murders. Rather, the death penalty was to be reserved only for the most culpable and blameworthy. The limits that the majority engrafts on the factor serve to narrow its application in some respects, but those limits do not coincide with the limits clearly expressed in the statutory language and strongly implied in the legislative history. Rather, they are fashioned solely to salvage the factor from

constitutional vulnerability, which, in turn, exists only because of the Court's awkward and incorrect initial interpretation.

Besides Senator Russo's statements about the limited scope of death-eligibility under the act, we also know that the Legislature rejected a broad pecuniary-gain aggravating factor. New Jersey's death-penalty statute, like those of most states, was based on the broad framework laid out by the 1962 Model Penal Code. The proposed Model Penal Code, however, contains a broader suggested aggravating factor: "The murder was committed for pecuniary gain." *See Gregg v. Georgia*, 428 *U.S.* 153, 194 n. 44, 96 *S.Ct.* 2909, 2935 n. 44, 49 *L.Ed.*2d 859, 886 n. 44 (1976) (quoting ALI, Model Penal Code § 210.6(3)(g) (Proposed Official Draft 1962)). The drafters of our statute flatly rejected that language, presumably in order to narrow the scope of the statute. Nevertheless, the Court today reads the broad language right back into the statute. *See ante* at 55, 695 *A.*2d at 1313 (terming c(4)(d) "the 'pecuniary gain' factor").

The Court asserts that the drafters of our statute "were presumably aware of interpretations that Florida gave to a similar factor, as well as the interpretations Arizona gave to its factor." *Ante* at 55, 695 *A.*2d at 1314. That presumption, however, ignores the fact that the language of the c(4)(d) factor was included in versions of New Jersey's death-penalty bill well before those states gave any interpretation to their own factors.[14] *See, e.g., S.* 880 (1979); *S.* 119 (1976); *S.* 46 (1976); *S.* 1286 (1974); *S.* 799

---

[14] The Arizona Supreme Court, in the very case cited by the majority, *ante* at 53, 695 A.2d at 1312, limited this factor to a hire for murder, that is, actually read that state's statute as "requir[ing] that the murder must have been committed for the *consideration* of financial gain." *State v. Madsen*, 125 *Ariz.* 346, 609 *P.*2d 1046, 1053 (emphasis added), *cert. denied*, 449 *U.S.* 873, 101 *S.Ct.* 213, 66 *L.Ed.*2d 93 (1980). Although that court then erred in interpreting "consideration" as any sort of "financial motivation on defendant's part for the murder," *ibid.*, the court's parsing of the Arizona statute was correct. *Cf. State v. Clark*, 126 *Ariz.* 428, 616 *P.*2d 888, 897 (Gordon, J., specially concurring) (arguing that Arizona's legislature "intended only to include the situation where defendant is a hired killer" in its statute), *cert. denied*, 449 *U.S.* 1067, 101 *S.Ct.* 796, 66 *L.Ed.*2d 612 (1980).

(1973). The Court's citation to Florida's statute, *ante* at 53, 695 *A.*2d at 1312, is unpersuasive. In Florida, any murder that is "committed for pecuniary gain" is death-eligible. *Fla. Stat. Ann.* § 921.141(5)(f). Thus, the statute is clearly broader on its face than our statute. *Cf. People v. Bigelow*, 37 *Cal.*3d 731, 209 *Cal.Rptr.* 328, 339–40, 691 *P.*2d 994, 1005–06 (1984) (narrowly interpreting a broad statute so that it applies only when the victim's death is in consideration for the receipt of financial gain); *Commonwealth v. Burgos*, 530 *Pa.* 473, 610 *A.*2d 11, 15 (1992) (refusing to interpret factor as applying to killing for insurance proceeds because, "[t]he plain language of the statute is limited to instances when a person pays or is paid to kill or contracts to kill another person based upon being paid or making payments").

With little support for its interpretation of the factor in the statute's plain language or legislative history, the Court attempts to bolster its position by citing prior case law.[15] The Court argues that its construction of the statute comports with "the consistent interpretation of the factor." *Ante* at 57, 695 *A.*2d at 1315. In support of that assertion, the Court cites *Marshall,* a case dealing with a defendant who hired someone to kill his wife, and the cases cited therein. In that case, however, the defendant obviously entered into a contractual arrangement for the murder of his wife. He acted as the principal in hiring the killer. His anticipation of the receipt of insurance proceeds as the beneficiary of an insurance policy on his wife's life constituted his motive or purpose to arrange for her murder—it did not constitute the "consideration" for the murder and formed neither the basis for death-eligibility

---

15 The Court also points to a bill that the Assembly rejected. Noting that "[a]n Assembly version of the Act would have included the expectation of the elimination of pecuniary loss as a potential aggravating factor," the Court opines that that language demonstrates "that the legislators believed that the factor was not limited to the case of the hired gun." *Ante* at 55, 695 *A.*2d at 1313. Rejected legislation is not informative in interpreting different passed legislation. It is as plausible to conclude that the failure of the bill to become law attests to the Legislature's rejection of the expansive reading that the Court now embraces.

nor the circumstance that satisfied the contract-killing aggravating factor.

Firm principles of statutory construction militate against interpreting the statute as the Court does today. We recently recognized that "[w]e are ... enjoined to construe penal statutes strictly and to construe ambiguous language against the State." *State v. Galloway*, 133 *N.J.* 631, 658–59, 628 *A.*2d 735 (1993) (citing *State v. Valentin*, 105 *N.J.* 14, 17, 519 *A.*2d 322 (1987), and *State v. Carbone*, 38 *N.J.* 19, 23–24, 183 *A.*2d 1 (1962)). That rule of strict construction "means that a statute shall not be extended by tenuous interpretation beyond the fair meaning of its terms lest it be applied to persons or conduct beyond the contemplation of the Legislature." *State v. Provenzano*, 34 *N.J.* 318, 322, 169 *A.*2d 135 (1961). Thus, "[w]here more than one reasonable interpretation may be made, or where the language is ambiguous—and the ambiguity is not manufactured by the defendant—the construction must be drawn against the state." *Valentin, supra*, 105 *N.J.* at 18, 519 *A.*2d 322. The majority flatly disregards that rule and its underlying purposes. *Ante* at 57, 695 *A.*2d at 1314 (observing rhetorically that "[h]ad anyone cared to mold conduct to avoid the imposition of a death penalty, the actor could easily have learned that other jurisdictions had already considered and rejected the argument...."). The rule of strict construction, however, is meant to give force to legislative intent, as well as to encourage legislators to be clear and precise in the drafting of criminal statutes. *See Moskal v. United States*, 498 *U.S.* 103, 107–08, 111 *S.Ct.* 461, 465, 112 *L.Ed.*2d 449, 458 (1990). Where, as here, the legislators clearly did not contemplate the situation that has arisen and, by their statements and their adoption of a narrow statute, may not have wanted it applied to the situation, the basic rule of strict construction dictates that we permit the Legislature to decide the scope of the statute.

Instead of crediting the Legislature with writing a narrowly tailored statute, the majority broadly interprets the scope of the factor and then virtually berates the drafters for configuring such

a broad—and unconstitutional—factor. In the guise of redeeming the unconstitutionally broad factor, the majority is forced to disregard its own rendition of the statutory language and "adopt a limiting construction of the pecuniary gain factor." *Ante* at 56, 695 *A.2d* at 1314. To find guidance for its "limited" interpretation, the Court looks to the language that a different capital defendant used in a different case and in a different context some three years ago. *Ante* at 56 & n. 4, 695 *A.2d* at 1314 & n. 4. The Court holds that for the factor to apply, "it must be found that the killing is the essential prerequisite to the receipt of the gain," or a "fatal precondition" for the murder. *Ante* at 56, 695 *A.2d* at 1314. That construction—itself vague and imprecise—defies the plain meaning of the factor, ignores the legislative history of the factor and the statute, and disregards basic rules of statutory construction.

There is no escape from the conclusion that the c(4)(d) factor encompasses only the murder committed by a defendant who was hired to kill and would be paid before or after the killing. The factor does not apply to those who murder to obtain the fruits of a robbery, to acquire the property of a victim, to inherit the victim's estate, or to collect on the victim's insurance. Those murders, to be sure, are reprehensible and despicable. The Legislature, however, has not reserved the death penalty for their commission.

### B.

Even assuming the validity of the Court's interpretation of the c(4)(d) factor, the trial court failed to instruct the jury in accordance with that interpretation. The court did not instruct the jurors that they must unanimously find, beyond a reasonable doubt, that "the killing [was] the essential prerequisite to the receipt of the gain," nor did the court instruct the jurors that they must find that the killing was a "fatal precondition" to the receipt of the insurance proceeds. The court instead told the jury only that, in order to find the existence of the c(4)(d) factor, it "must unanimously find, beyond a reasonable doubt, that, at least, one of

the purposes John Chew had, for murdering Theresa Bowman, was to obtain the insurance proceeds." The court's only additional explanation of that factor provided little further guidance:

[A]lthough the receipt of the insurance proceeds does not have to be the defendant's exclusive purpose for killing Theresa Bowman, the receipt of such proceeds must be much more than just an incidental benefit to the defendant, because of Theresa Bowman's death. That is, the expectation of pecuniary gain must be the cause of the murder, or one of the causes of the murder, and not a result of it.

The trial court's repeated pronouncements that the receipt of the insurance benefits could merely be one of the reasons for the killing is plainly inconsistent with the Court's ruling today, which requires a much more substantial causal connection.

That omission cannot be treated dismissively, nor its potential for serious prejudice discounted. First, the c(4)(d) factor was the sole aggravating factor. Second, it cannot be overemphasized that the jury, by varying votes, determined the existence of the catch-all mitigating factor. Most of the jurors found that that factor was established by ten mitigating circumstances, *viz:* (1) defendant was emotionally and culturally deprived by his parents; (2) defendant suffered from a serious mental and emotional disturbance as a youth; (3) defendant was raised in a violent home by irresponsible parents; (4) defendant was often abandoned by his parents; (5) defendant's parents raised him to believe that he was worthless, which led him to substance abuse later in life; (6) defendant's parents engaged in inappropriate sexual behavior in front of their children; (7) defendant's parents failed to protect him from harm, including sexual and physical abuse by relatives; (8) defendant's family moved frequently, ignoring the educational needs of the children; (9) defendant continues to play an important role in his eleven-year-old daughter's life; and (10) any other mitigating circumstance not listed. The jury, in determining that those circumstances were outweighed by the sole aggravating factor, did so with an understanding of that factor that was incomplete, inaccurate, and misleading.

Proper jury instructions are essential in any criminal case and are absolutely vital in a capital case. *State v. Bey,* 112 *N.J.* 123,

162, 548 *A*.2d 887 (1988) (*Bey II* ), *cert. denied,* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995). The instructions delivered here were inadequate in guiding the jury. Because those instructions undermine an accurate evaluation of the sole basis for imposing the death sentence, their prejudicial impact cannot be ignored, and defendant's death sentence must be vacated.

## II

Defendant contends that the trial court erred in denying his request for a definition of the term "accomplice" during the court's charge on the element of "own conduct," a basic requirement for determining whether the murder was death-eligible. I agree and would vacate his death sentence on that ground alone.

A person convicted of murder is eligible for the death penalty only if he or she murdered by his or her own conduct, procured the murder by payment or promise of payment of anything of pecuniary value, or, as the leader of a narcotics trafficking network, commanded or by threat or promise solicited the commission of the murder. *N.J.S.A.* 2C:11–3 c. The jury's determination of whether a death-eligibility "trigger" is present occurs subsequent to a determination of whether a defendant is guilty of purposeful-or-knowing murder; it "is simply irrelevant to the question of whether defendant is guilty of purposeful or knowing murder." *State v. Gerald,* 113 *N.J.* 40, 100, 549 *A.*2d 792 (1988).

During guilt-phase proceedings, the jury first must determine whether defendant should be convicted of murder, *considering, where appropriate,* principles of vicarious liability under *N.J.S.A.* 2C:2–6. Only after it has unanimously found defendant guilty of purposeful and knowing murder should the jury turn to the question of whether defendant committed the homicidal act by his or her own conduct.

[*Ibid.* (emphasis added).]

*See also State v. Brown,* 138 *N.J.* 481, 510, 651 *A.*2d 19 (1994) (reiterating same point made in *Gerald* ); *State v. Moore,* 113 *N.J.* 239, 300, 550 *A.*2d 117 (1988) (same).

The "own conduct" requirement, thus, "is not an element of the offense of murder. [Rather, i]t is merely a triggering device for

the death penalty phase of the trial." *Gerald, supra,* 113 *N.J.* at 99, 549 *A.*2d 792 (citation and quotations omitted). An accomplice or a vicariously liable coconspirator, consequently, may be convicted of murder, but is not death-eligible.

> With the sole exception of murder for hire, *see N.J.S.A.* 2C:11–3c, a defendant whose conviction is based on a theory of vicarious liability cannot be subjected to death-penalty proceedings. Only those murderers whose conviction[s] rest[] on their status as principals—those who have committed the homicidal act by their own conduct—or on the fact that they have hired another to commit the crime may face the death penalty.
>
> [*Id.* at 100, 549 *A.*2d 792.]

In sum, "defendant must have '*actively and directly participated* in the homicidal act, i.e., in the infliction of the injuries from which the victim died.'" *State v. McDougald,* 120 *N.J.* 523, 561, 577 *A.*2d 419 (1990) (quoting *Gerald, supra,* 113 *N.J.* at 97, 549 *A.*2d 792).

Further, the rational-basis threshold for submission of an accomplice charge is low, requiring only "minimally adequate" evidence supporting an accomplice theory. *State v. Pennington,* 119 *N.J.* 547, 561, 575 *A.*2d 816 (1990). In *Gerald, supra,* this Court held that the "remote[]" possibility that the jury could have believed that defendant was merely an accomplice rendered the omission of the accomplice charge an error with "the capacity to visit substantial prejudice on a defendant." 113 *N.J.* at 100, 549 *A.*2d 792; *see also State v. Long,* 119 *N.J.* 439, 462, 575 *A.*2d 435 (1990) (comparing the failure to provide serious-bodily-injury and accomplice charges to failure to charge lesser included offense and citing standard for provision of charge as whether "there is any evidence 'that would have afforded the jury a rational basis' for convicting the defendant of the lesser offense") (quoting *Moore, supra,* 113 *N.J.* at 290, 550 *A.*2d 117). Moreover, a defendant's theory at trial need not incorporate or be consistent with the accomplice charge. *State v. Brent,* 137 *N.J.* 107, 118, 644 *A.*2d 583 (1994); *Long, supra,* 119 *N.J.* at 464–65, 575 *A.*2d 435.

In this case, although defendant's trial counsel did not argue that defendant may have worked with another as an accomplice, the record provides a basis for a jury to conclude as much. The

testimony and evidence inculpating defendant was meager and contradictory. Crystal Charette, for example, first provided a false alibi for her brother, and then, after learning of potential murder charges pending against her, altered her story approximately six times, with facts that she recalled, for the most part, when she was "high." Further, certain aspects of Charette's testimony were strongly refuted, such as her belief that she heard the victim scream as defendant exited the car, when even the police believed that that was impossible because of the manner in which the victim's throat was cut. Other statements made by Charette were exculpatory of defendant, such as her explanation of events to her daughter that defendant approached her car from the hotel rather than the Corvette.

The credibility of other witnesses also was questionable: Helen Bowman, who had sexual relations with defendant on one occasion, was implicated in the murder by Charette and faced a potential murder charge resulting from the incident; Robert Chew, who had a strained relationship with defendant, may have been motivated to lie so that he could garner early release from prison, and may have lied about his deal with the State; George Tilton was fired by defendant without receiving the money that defendant owed him and testified inconsistently with Robert Chew about the nature of their contact prior to telephoning the police about the murder; Randy Findeis was Bowman's lover; David Charette, who testified that defendant vaguely informed Charette about an upcoming "scam," also admitted a prior history of strained relations with defendant; and Officer Seabasty only saw the back of someone's head and did not file a supplemental report based on his conclusion. Moreover, defendant accurately points out that there was no physical evidence linking him to the murder.

The record does contain evidence supporting the theory of a failed drug deal resulting in murder. That evidence is based on defendant's confession, the beeper number belonging to a man named Joe from Newark (which was belatedly investigated); testimony by defendant's son, Robert Chew, that defendant showed

him a kilo of cocaine that defendant intended to sell in New Jersey and his testimony that a kilo of cocaine was worth approximately $28,000; testimony by Randy Findeis that Bowman told him that she and defendant were going to pick up a "settlement check" worth $28,000 on the night of her murder; testimony that, while at Charette's home prior to leaving for Woodbridge, Bowman criticized defendant for offering to trade some cocaine for Helen Borden's marijuana, because defendant had more than enough cocaine to share; and the cocaine found in Bowman's nose, blood stream, and bagged in her socks.

Defendant additionally argues that "since there was evidence presented that the defendant attempted to hire others to kill Bowman, there is [also] a possibility that he was involved in the planning of the murder, but not the actual killing." The evidence to which defendant refers is the testimony of George Tilton and defendant's son that defendant repeatedly solicited them to kill Bowman for a share of the insurance proceeds. Both men testified that they had refused the invitations. Nonetheless, the evidence permits the inference that defendant may have tried to hire a third person, especially given the eyewitness who stated that it was not defendant whom he saw in the Corvette the night of the murder.

There was minimally adequate evidence warranting the submission of the accomplice charge on either one of two theories. There was strong evidence put forth by the State and key to its case that defendant repeatedly had attempted to hire individuals to kill Bowman. All of the evidence that defendant wanted Bowman dead so that he could collect the insurance proceeds also supported the theory that defendant had hired someone to kill her in exchange for a portion of the insurance proceeds. The fact that Bowman was murdered in a manner nearly identical to that proposed by defendant when seeking to hire Tilton lends additional support. Most important, though, is the testimony of Mecalco that the person he saw in the Corvette the night of the murder was someone other than defendant. Taken together, there emerg-

es from the evidence at trial a rational alternative explanation of the murder.

The omission could not have been harmless based on defendant's theoretical death-eligibility for having agreed to pay someone to commit the murder. The request for the accomplice charge would not have placed defendant in additional jeopardy of the death penalty based on his having paid money to have Bowman killed because defendant was indicted only on the basis of murder by his own conduct. Every murder indictment must specify the triggering element. *R.* 3:7–3(b) ("Every indictment for murder shall specify whether the act is murder as defined by *N.J.S.A.* 2C:11–3(a)(1), (2) or (3) and whether the defendant is alleged: (1) to have committed the act by his or her own conduct *or* (2) to have procured the commission of the offense by payment or promise of payment, of anything of pecuniary value. . . .") (emphasis added). Because the State did not choose to present the hire-for-murder theory to the grand jury and because the grand jury did not indict defendant on that theory, the State could not ask the guilt-phase jury to find that death-penalty trigger. As observed by the majority, "[e]ven if the jury believed that Chew did not kill Theresa but, rather, hired the Kenny Rogers look-alike, it could not find, without the defendant's consent, the procuring factor without an indictment charging it." *Ante* at 73, 695 *A.*2d at 1323. Thus, at the time the case was submitted to the guilt-phase jury, defendant was death-eligible only on a theory that he personally had murdered Bowman (*i.e.*, murder by his own conduct). If the jury had found that defendant hired someone else to kill the victim, defendant clearly could have been convicted of murder, but the case would not have advanced to the penalty phase for a determination of death-worthiness.

Because the evidence was minimally adequate to support a theory of accomplice liability and because it justified an explanation of that theory, the error cannot be considered harmless. In *Brown, supra,* 138 *N.J.* 481, 651 *A.*2d 19, the trial court omitted the accomplice charge in a recharge to the jury. The Court noted

that the omission had created "the potential for prejudice." *Id.* at 530, 651 *A.*2d 19. That potential was real, *viz:*

The omission prevented the jury from adequately considering the alternatives to the own-conduct theory, namely, accomplice or co-conspirator liability, and thus in effect subtly encouraged the jury to choose the only remaining theory, which rendered defendant death eligible.... Similarly, the failure adequately to instruct that the jury could convict defendant of murder under a conspiracy or accomplice theory indirectly encouraged a finding of own conduct.

[*Id.* at 569, 651 *A.*2d 19 (Handler, J., concurring in part and dissenting in part).]

The error in this case, in a sense, is even more egregious than that in *Brown.* The failure to provide an accomplice charge when the evidence could have supported such a finding mandates reversal of the death sentence. Because a finding of accomplice liability would not have affected a determination of defendant's guilt for murder, however, his conviction for non-death-eligible purposeful-or-knowing murder can stand.

## III

A serious issue is posed by the admission at trial of the out-of-court statements of Helen Borden and Crystal Charette inculpating defendant in the murder. The majority determines that those extremely damaging statements were properly introduced into evidence and rejects defendant's contention that the statements should not have been admitted as substantive evidence of the offense. *Ante* at 81–82, 695 *A.*2d at 1328.

Prior to the commencement of the State's direct examination of Helen Borden, the prosecutor advised the trial court of his intention to introduce, on redirect examination, Borden's and Charette's prior consistent statements obtained on January 23, 1993, the day of defendant's arrest. Although Borden's and Charette's first statements to the police made on the night of January 14 exculpated defendant, on January 23, they both provided statements, largely consistent with their trial testimony, that inculpated defendant. The prosecutor anticipated "a strong attack" on Borden's and Charette's credibility, and, on that basis, he intended to offer on redirect examination the prior consistent statements. Further-

more, the prosecutor indicated that the witnesses did not have an "improper motive" when giving their statements. Defense counsel objected to the introduction of the prior consistent statements, stressing that if the motive to falsify existed at the time the statements were given as well as at the time the testimony was presented, the original statements would have no additional probative value warranting their admission.

The court refused to rule on the issue prior to the cross-examination of Borden. Later, in the course of the testimony, the trial court ruled the prior consistent statement admissible because of defense counsel's attack on Borden's credibility. Specifically, the court pointed to defense counsel's argument "of the police feeding Helen Borden information that would be the reason why she would change her testimony." Indeed, the trial court felt that defense counsel had made a "very good showing" that Borden had changed her statement.

Regarding Crystal Charette, during her direct examination, the prosecutor elicited testimony that on January 23, she had made a prior statement consistent with her testimony at trial. Charette testified that she had decided to tell the truth to the police on January 23, " 'cause I couldn't take it no more." She denied being threatened by the police and stated that it had been because of her conscience and because she could not sleep that she had decided to tell the truth. The prosecutor then elicited information about Charette's plea agreement.

On cross examination, defense counsel suggested that Charette had been influenced to provide her January 23 statement because of the threat of a thirty-year prison term. Charette continued to deny that she had been influenced to change her statement, but she did admit that she had been "easily influenced by being told by the police that [she] could go to jail for thirty years." Defense counsel also elicited information about the plea agreement and the fact that Charette had been promised a noncustodial sentence in exchange for her testimony. Moreover, Charette admitted to having been high on marijuana when she gave her statement on

January 23. After the cross examination of Charette, the prosecutor expressed his intention to play the tape recording of Charette's prior consistent statement made on January 23. Defense counsel renewed his previous objections, but the trial court permitted the prosecutor to play the statement to the jury.

The Court acknowledges that when they gave those statements, both Borden, who was then charged with theft, and Charette understood that they could be charged with murder and obstruction of justice and subject to long prison terms. The Court, however, rejects those critical facts as bearing on the witnesses' motives to lie, observing simply that "cross-examination tested whether the witnesses were further motivated by their plea agreements and whether the police had fed them with the details of their stories." *Ante* at 80, 695 *A*.2d at 1327.

New Jersey's rule on the admissibility of prior consistent statements was previously contained in *Evidence Rule* 20, which stated that "[a] prior consistent statement shall not be admitted to support the credibility of a witness except to rebut an express or implied charge against him of recent fabrication ...." That rule was interpreted as *not* containing a temporal requirement "that a party seeking admission of a prior consistent statement show that the prior statement was made before any alleged motive to falsify existed on the part of the declarant." *State v. Johnson*, 235 *N.J.Super.* 547, 556, 563 *A*.2d 851 (App.Div.), *certif. denied*, 118 *N.J.* 214, 570 *A*.2d 971 (1989).

Effective July 1, 1993, *Evidence Rule* 20 was replaced by a new rule that mirrored federal Rule 803(a). The current rule provides, in pertinent part, that:

> The following statements are not excluded by the hearsay rule:
>
> (a) ... A statement previously made by a person who is a witness at a trial or hearing, provided it would have been admissible if made by the declarant while testifying and the statement:
>
> \* \* \* \* \* \* \* \*
>
> (2) is consistent with the witness' testimony and is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive....

*[N.J.R.E. 803(a)(2).]*

Commentary accompanying the evidence rules explains:

> *N.J.R.E. 803(a)(2)* follows Fed.R.Evid. 801(d)(1)(B) and has no analogue in prior New Jersey rules governing hearsay exceptions, although it is related to the common law exception for "fresh complaint," discussed at N.J.R.E. 803(c). It was adopted in order to allow the use as substantive evidence of those prior statements of a witness which would be admissible also under N.J.R.E. 607 purely on the issue of credibility, that is, to rehabilitate a witness if his or her credibility was attacked.
>
> [Biunno, *New Jersey Rules of Evidence,* at 776 (1996).]

Although federal courts were split over whether the federal rule contained a temporal requirement, in 1995, the United States Supreme Court provided a definitive answer. In *Tome v. United States,* the Supreme Court unequivocally held that only prior consistent statements made before the alleged motive to fabricate arose are admissible under the federal rules. 513 *U.S.* 150, 165–67, 115 *S.Ct.* 696, 705, 130 *L.Ed.*2d 574, 582–83 (1995).

The *Tome* majority's holding is persuasive. As the Court explains: "[T]o be logically relevant to rebut a charge of testifying while under an improper influence or motive, a prior consistent statement must have been made before the point at which the story was fabricated or the improper motive or influence arose. Otherwise, the prior statement does nothing to rebut the charge." *Ante* at 80–81, 695 *A.*2d at 1327–1328; *see United States v. Forrester,* 60 *F.*3d 52, 64 (2d Cir.1995) (following *Tome* and excluding a prior statement made to the police because the witness's "motive to shade the truth existed before she drafted the contested statement"). In addition, most foreign jurisdictions appear to have followed the *Tome* rationale. *See, e.g., People v. Bobiek,* 271 *Ill.App.*3d 239, 207 *Ill.Dec.* 704, 707–08, 648 *N.E.*2d 160, 163–64, *appeal denied,* 162 *Ill.*2d 571, 209 *Ill.Dec.* 804, 652 *N.E.*2d 344 (1995); *Fields v. Commonwealth,* 905 *S.W.*2d 510, 512 (Ky.App.1995); *State v. Haslam,* 663 *A.*2d 902, 908 (R.I.1995).

The Court concludes that the prior consistent statements by Borden and Charette were admissible. It explains that "[t]his is not the case in which to plumb the nuances between the substantive and supportive uses of prior consistent statements. Given the

relationship among the several statements, the court did not err in admitting the January 23 statements." *Ante* at 81, 695 *A.2d* at 1328. I disagree.

As the United States Supreme Court recognized, "in some cases it may be difficult to ascertain when a particular fabrication, influence, or motive arose." *Tome, supra,* 513 *U.S.* at 165–66, 115 *S.Ct.* at 705, 130 *L.Ed.*2d at 587. The State implausibly argues that Borden's and Charette's motivations to lie did not arise until they actually entered into the plea agreements. The evidence demonstrates, however, that on January 23, both Borden and Charette were well aware that they were potentially facing murder and obstruction charges. Borden also had a pending theft charge. It is uncontested that immediately prior to the statements, both women were told that they faced thirty years of incarceration. The declarants' motivation to lie arose with their realization that they were facing criminal charges and jail time and that the only way out of their predicament was to alter their stories. That realization occurred prior to the January 23 statements.

Moreover, the error in admitting those statements was not harmless. The credibility of Borden and Charette was crucial in the case. In fact, had the jury not believed their stories, defendant would not have been convicted. Indeed, their credibility was a hotly contested issue. Both Borden and Charette initially had provided statements that exculpated defendant. The prosecutor received an enormous advantage by having their inculpating version of events repeated numerous times. The sinister influence of repeated testimony on a jury's perception of the facts is well-understood:

> The rule permitting extra-judicial, consistent statements of a witness is an unusual one; it should be applied with caution.... Otherwise a witness'[s] credibility will "depend more upon the number of times he has repeated the same story than upon the truth of the story itself."
>
> [*State v. Griffin,* 19 *N.J.Super.* 581, 587–88, 89 *A.2d* 67 (App.Div.1952) (quoting 58 *Am.Jur.,* "Witnesses," § 819).]

The prior consistent statements insidiously augmented the prosecution's evidence. The prejudicial impact of those statements must be gauged against the weakness of the case against defendant, the importance of Borden's and Charette's in-court statements, and the general lack of credibility of the witnesses. Admission of the prior statements could reasonably have had an effect on the jurors. Thus, the admission of the January 23 statements was not harmless and requires reversal of defendant's murder conviction.

## IV

Strong reasons warrant the reversal of defendant's murder conviction and death sentence. I dissent.

Justice STEIN joins in Part IA of this opinion.

*For affirmance*—Chief Justice PORITZ, and Justices POLLOCK, O'HERN, GARIBALDI and COLEMAN—5.

*For reversal*—Justice HANDLER—1.

*For affirmance in part; for reversal in part*— Justice STEIN—1.